# Commonwealth *v*. Gearhardt, Appellant.

205    387
226   ²196

*Criminal law—Murder—Insanity.*

Where on the trial of an indictment for murder, the evidence shows beyond doubt that the killing was premeditated and deliberate, and the defense is that the prisoner at the time was suffering from delirium following typhoid fever, and the court instructs the jury that if the prisoner was laboring under such form of insanity at the time of the killing, and that it was of such a degree as to blind him to the natural consequences of his moral duty and to destroy his perceptions of right and wrong, he was wholly unaccountable, the prisoner has no standing to complain of a verdict of guilty of murder of the first degree.

*Criminal law—Murder—Evidence—Laymen as witnesses.*

On the trial of an indictment for murder where the defense is insanity,

laymen who are called as witnesses for the commonwealth, after stating their opportunities of knowledge, may be permitted to state that they saw nothing in the conduct of the prisoner which indicated to them unsoundness of mind.

*Criminal law—Murder—Separation of jury—Barber.*

While it is reprehensible practice to permit jurors during a murder trial to separate so far as to go to a barber shop, although under charge of an officer, yet if there is no evidence at all of communication on the part of outsiders with the separated jurymen by reason of this separation, a verdict of guilty of murder of the first degree will not be set aside.

Argued March 31, 1903. Appeal, No. 51, Jan. T., 1903, by defendant, from judgment of O. & T. Northumberland County, No. 1, Feb. T., 1902, on verdict of guilty of murder in the first degree in case of Commonwealth v. Jacob Gearhardt. Before MITCHELL, DEAN, FELL, BROWN, MESTREZAT and POTTER, JJ. Affirmed.

Indictment for murder.

The circumstances of the killing are narrated in the opinion of the Supreme Court.

Verdict of guilty of murder of the first degree.

*Errors assigned* were to various instructions and rulings on evidence, sufficiently stated in the opinion of the Supreme Court.

*James Scarlet*, with him *A. G. Marr*, for appellant, cited on the question of insanity: Com. v. Mosler, 4 Pa. 264; Com. v. Farkin, 2 Clark, 208; Ortwein v. Com., 76 Pa. 414; Brown v. Com., 78 Pa. 122; Taylor v. Com., 109 Pa. 262; Com. v. Wireback, 190 Pa. 138; Meyers v. Com., 83 Pa. 131; Jones v. Com., 75 Pa. 403.

*H. W. Cummings*, district attorney, and *D. W. Shipman*, for appellee, were not heard.

OPINION BY MR. JUSTICE DEAN, April 20, 1903:

More than one year ago, February 8, 1902, the defendant was convicted in the court below of murder of the first degree; then, after a motion for a new trial and full argument, on January 26, 1903, he was sentenced to death. Of whatever de-

fendant may complain, he certainly cannot have any ground to allege that there was undue haste in entering judgment against him. The court below fully heard him by counsel on motion for a new trial after affording him ample time and every opportunity to be heard. He now brings this appeal, alleging fifteen errors in the trial proceedings which prejudiced him and tended to produce a conviction. Before particularly discussing the alleged errors, it is proper to briefly notice the undisputed facts.

The defendant, Jacob Gearhardt and his wife Maggie had been married for many years ; they lived in Shamokin ; had a family of four sons aged respectively, ten, twelve, fourteen and sixteen years. Defendant was aged about forty years, and was a carpenter and builder by occupation. In the spring of 1901 he had been working at a coal tipple in West Virginia ; about the middle of July of that year he returned to his home in Shamokin ; at that time he had an attack of typhoid fever which kept him to his bed until the following August ; he was then able to get up and go about town as usual ; for years before this time, there had been bickerings and quarrels between him and his wife ; there was more than suspicion on his part of her marital infidelity ; about this time she notified him of her intention to leave him ; he remonstrated and tried to persuade her to abandon her intention, but she persisted in her determination and fixed the date of her going as Tuesday morning, August 13th. On Monday the 12th, the day before, he went to a hardware store and bought a revolver ; on Tuesday morning he went to a bar in the town and took two drinks of liquor, then returned to his house, met his wife and asked her if she was going to move ; she replied " Yes " ; he immediately shot her twice with the revolver and she fell mortally wounded. He then turned the revolver on himself firing two more shots, one of which took effect in his head, but neither proved fatal, and in due time he recovered and was put on trial for the murder of his wife. On the Saturday before the killing he had been seen by one of his sons busy writing and then putting something in his trunk. On examining the trunk after the homicide an envelope was found addressed to the " Citizens of Shamokin ; " inside was a letter in pencil, part English and part German, in his handwriting and signed with his initials,

J. G., in which he gives the year of his marriage 1885 and narrates, in part at least, his marital troubles, accuses his wife of infidelity and closes with this language: "She wants to move and I think the best moving, is us both to the cemetery. That is all, so goodby children."

The facts as we have stated them are indisputable. The evidence shows beyond reasonable doubt, that he wrote the letter on the Saturday before the killing and put it in his trunk; clearly, he intended to kill his wife and himself and gave this explanation of his motive. The killing then was premeditated and deliberate with fully formed intent to kill; it was, therefore, malicious; this the law pronounces murder of the first degree. The defense was insanity, or rather temporary dementia or delirium of that form which often results from disease, such as fever. If this delirium existed when the shots were fired, the burden was on the prisoner to prove it; the presumption is, he was sane and it was on him to show by the weight of the evidence that at the time he fired the shots he was not. Counsel for appellant properly argues, that if the aberration was from fever and but temporary in its nature, yet if it existed at the time of the commission of the act, it is a defense even though soon after he returned to his right mind. The exact cause of the dementia and its duration are not material; the question is, did it exist at the time the pistol was fired so as to destroy his judgment and render him incapable of distinguishing between right and wrong.

The court plainly so instructed the jury thus: "It is contended by the defense, not denied by the commonwealth, known to the medical profession, known to many people, perhaps most people, that a person in a delirious state of mind which often follows an attack of fever, especially typhoid fever, is wholly unaccountable for his conduct and actions." And he further, very fully elaborated the same thought and instructed the jury, that if the defendant when he committed the act was laboring under such form of insanity he was wholly unaccountable. He further instructed them that such "delirium must have existed to so great a degree as to blind him to the natural consequences of his moral duty and must have utterly destroyed his perceptions of right and wrong." Then further, he instructs them: "If he had sufficient power of memory to recollect the relation

in which he stood to others and others stood to him, that the act in question was contrary to the plain dictates of justice and right, injurious to others and a violation of the dictates of duty he would be responsible." It must be borne in mind that the whole of the instruction is based on the evidence before the court. The defendant had adduced evidence tending to show that for five weeks immediately preceding the act he had occasional fits of delirium, such as usually follow fevers; this was denied by the commonwealth; therefore, whether delirium had existed at all was a question for the jury. It is argued, that it was the duty of the court to explain to the jury the distinction between mania and such delirium; but this also was a fact to be ascertained by the jury from the evidence, so far as such distinction was material. The court heard the evidence of experts, listened to the citations from reputable medical authorities which undertook to point out the distinction, but even they did not fully agree; after all we doubt whether the court or any lawyer was more capable of defining the exact distinction then an intelligent layman.

The court could have pointed out and defined when the use of the words "heirs of the body" are words of purchase and when they are words of limitation, but we doubt if twelve learned physicians who had given the subject no particular thought, would have clearly understood him. So we doubt if the learned court below in the conflict of evidence and technical medical authority could have clearly defined and explained the distinction between mania and delirium, so as to make that distinction clear to the jury. From his learned argument here and in his paper-book the distinction is probably clear to appellant's counsel; but he has given the subject much thought; the citations in the paper-book evince much study and research; but the court below, to reach the same conclusions, would have had to adjourn for weeks of study. The court did, however, what was far more important, that is, instructed the jury, that if defendant's mind was so benumbed or perverted by delirium or mania, that he was incapable of distinguishing between right and wrong, he was not responsible and his defense was sustained. According to the evidence, counsel for appellant argues, that if defendant was affected with delirium, then his faculties were completely beyond his

control; this may be, although we do not think the evidence settles it as a fact, then, under the instructions on the question of insanity, it was the plain duty of the jury to acquit and they must have so understood, as is evident from this excerpt from the charge:

"The jury must be satisfied by fairly preponderating evidence, and the questions of reasonable doubt do not apply to this phase of the case, to this defense of insanity, or abnormal condition of the mind, delirium, .... defendant must show by fairly preponderating evidence, in order to excuse an unlawful killing, that the condition of defendant was such, at the time, that he could not reason and could not understand right from wrong. In other words, he was out of his mind to use the most common phrase."

This was in effect, saying to the jury, that whether from delirium or any form of dementia he was out of his mind, he was irresponsible. Taking the charge as a whole, it is clear from any error of which defendant can justly complain. This disposes of appellant's first to eleventh assignments of error inclusive; they are all overruled.

The twelfth and thirteenth assignments relate to the competency of two experts, physicians, called to testify that soon after the shooting the defendant feigned unconsciousness. On an examination of their testimony and the facts stated by them, the physicians were competent to give their opinions; the value of their opinions was for the jury, but they were admissible.

The fourteenth assignment avers that the court erred in not sustaining objections to the competency of a number of laymen called as witnesses. They were not called to give their opinions. After stating their opportunities of knowledge, they said they saw nothing in the conduct of defendant which indicated to them unsoundness of mind. This was competent evidence although the witnesses were not experts : Commonwealth v. Wireback, 190 Pa. 138.

The fifteenth assignment is, that the court erred in admitting in evidence the letter written the Saturday before the shooting and certain other writings as standards for comparison of handwriting. This evidence was clearly admissible and the assignment is overruled.

Another complaint is that the jury separated during the trial. It seems part of them went into a barber shop and were shaved and that this not seldom occurs in the trial of capital cases in that county; if so, it is a practice which ought to cease. There is a necessity for the services of a barber during a prolonged trial, but this is a necessity which can be met by the barber serving them in their room in the presence of an officer having the jury in charge; to permit them to separate and some of them to go to a public room where they might be brought in contact and communication with others, was a palpable violation of the unbroken practice of the courts of oyer and terminer, especially in capital cases and meets with our condemnation. If there had been any evidence at all, of communication on the part of outsiders with the separated jurymen, by reason of this separation, we would set aside the verdict. But the testimony of the jurors who went to the shop is that no one spoke to them during the time they were there and that one of the tipstaves who attended them was present with them all the time of their separation. While we unhesitatingly condemn such indifference to their oath on the part of the officers and such heedlessness of duty on the part of the jurors, for they doubtless heard the oath administered to the tipstaves, we will not conclusively presume that the mere fact of separation prejudiced the defendant. The most we can say, is that it might have done so, but the testimony shows it did not.

We can detect no error which would warrant us in setting aside this verdict. All the assignments are overruled and the judgment is affirmed. It is further directed that the record be remitted to the court below, that the judgment may be carried into execution according to law.