Commonwealth *v.* Moon, Appellant.

Argued June 25, 1956. Before STERN, C. J., JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Edward Dumbauld,* with him *Thomas A. Waggoner, Jr., Samuel D. Braemer, John Duggan, Jr.,* and *E. H. Beshlin,* for appellant.

*Frank P. Lawley, Jr.,* Deputy Attorney General, with him *Harrington Adams,* Deputy Attorney General, for appellee.

OPINION BY MR. JUSTICE CHIDSEY, October 3, 1956:

On January 13, 1954 the appellant Norman W. Moon appearing before the Court of Quarter Sessions of Warren County on a charge of failure to comply with a support order, shot and fatally wounded the Honorable ALLISON D. WADE, President Judge of the 37th Judicial District. Following his apprehension appellant was indicted, tried and on May 25, 1954 convicted of murder in the first degree. The jury rejected his sole defense of insanity and fixed the penalty at death. About two months thereafter, on July 31, 1954, while appellant was confined in the Warren County Jail pending disposition of his motion for new trial, the county sheriff as keeper of the jail petitioned the court for the appointment of a commission under The Mental Health Act of June 12, 1951, P. L. 533, as amended, 50 PS §§1071-1622. Without holding a hearing on the petition, the court on July 31, 1954 appointed a commission composed of two physicians and an attorney to investigate appellant's mental condition. After examining the defendant and holding hearings at which testimony and statements were taken, the commission on October 13, 1954 filed its report with the court in which it found that Moon was mentally

ill, the illness being diagnosed as dementia praecox of the paranoid type, an illness chronic and continuing, and that he was a proper subject for commitment to a mental hospital. The commission also found that with the exception of two periods of acute mental disturbance, one at the time of his commitment and the other after the commission first met, both of which disturbances promptly subsided, appellant ". . . knew why he was in jail . . ., knew that he faced a sentence in accordance with the jury verdict . . ., knows that he is on trial for his life . . ., recalls his trial . . ., admits that no one is justified in taking anyone else's life . . ., knows that it is not right to shoot anybody . . ., and what the consequences of his acts might be . . .". The court after reviewing the report of the commission and the evidence on which it was based, was not satisfied that the defendant was a proper subject for commitment and directed that the proceedings in his case should continue. In arriving at this conclusion the court applied the law as it existed prior to the enactment of The Mental Health Act of 1951. The defendant appealed to this Court and in a decision handed down October 5, 1955, see 383 Pa. 18, 117 A. 2d 96, we held that The Mental Health Act of 1951 had changed the test to be used in staying criminal proceedings and that the test prescribed by it was whether the defendant had a mental illness which so lessened his capacity to use his customary self-control, judgment and discretion in the conduct of his affairs and social relations as to make it necessary or advisable for him to be under care. We therefore remanded the record and directed the court to reexamine the commission's findings and recommendation and to reconsider the evidence "together with additional relevant evidence" in the light of the statutory definition of mental illness.

Thereafter counsel for the Commonwealth requested the court to fix a hearing to receive additional relevant evidence as to the defendant's conduct between the time of his examination by the commission and the filing of the opinion of this Court, a period of approximately fifteen months. The court notified the defendant's counsel of the Commonwealth's request for hearing and the nature of the testimony it proposed to produce and suggested that a date for hearing be agreed upon far enough in the future to afford counsel for the defendant opportunity to determine and prepare any evidence which he might desire to produce at such hearing. Counsel for the defendant and the Commonwealth agreed on December 12, 1955 as the date for hearing. At this hearing seven employes of the Western State Penitentiary to which defendant had been removed in April, 1955 testified, namely, the warden, the prison doctor, the three guards who had been continuously in charge of the defendant in eight-hour shifts, a guard who supervised visits from members of the defendant's family, and the guard who read all letters written by the defendant in his capacity as mail censor. At the completion of their testimony defendant's counsel advised the court that he had no testimony to offer. The prison doctor testified that he made a physical examination of the defendant upon his admission and thereafter saw him at least once a week; that defendant was well nourished and physically active; that aside from an affliction in the middle ear which caused a ringing in the ears, and a few stomach upsets which were easily controlled, the defendant was physically well; that he observed the defendant at times reading in his cell and at times in the exercise yard playing games with other prisoners. The warden testified that the defendant participated in the exercise periods, both morning and evening; that he ob-

tained books and magazines from the library, corresponded with his family and friends, and purchased items from the prison commissary; that he was visited once a month by various members of his family, and once each day by someone from the medical department as were all others confined in the isolation block; that the defendant had requested and received visits from the prison chaplain. The three guards who were in charge of the defendant at all times except some Saturdays and Sundays, testified to numerous contacts and conversations with the defendant and observed him continuously for almost eight months; that his conversation and all his actions were normal and that they noted no unusual or abnormal conduct; that he regularly drew from the prison library at least three books a week, sometimes six; that he subscribed to two magazines, "The Argosy" and "Hunting and Fishing"; that he also had access to and read other magazines such as "Life" and "Time"; that he shaved regularly; that he didn't smoke. One of the guards, Lieutenant King, testified that he supervised visits which defend-ant received from his mother and brother; that there were no restrictions on defendant's visiting privileges and the visits lasted about a half hour under his constant supervision. William E. Holmes, who was mail censor of the prison, testified that he read all letters written by the defendant which were about sixty in number; that he wrote to his father, mother, brothers and an aunt, and to a former employer; that nothing unusual was noted in any of the letters and that no items were included which had to be stricken out. This witness testified that he noticed nothing in connection with the letters which might indicate a lack of self-control or judgment or discretion, and all of the witnesses similarly testified with respect to the defendant's conduct generally, which was normal throughout.

No complaint of misconduct on the part of the defendant was ever made. All of the witnesses had been associated with the Western State Penitentiary for periods ranging from five to thirty-two years.

Thereafter the court filed an opinion and the following order: "And now, January 28, 1956 the Court having reexamined the findings and recommendation of the Sanity Commission appointed in this case, and having reconsidered the evidence together with additional relevant evidence, as directed by the Supreme Court of Pennsylvania, and for the reasons set forth in the foregoing Opinion, and upon consideration of the entire record in the case, and the Court not being satisfied that the defendant is mentally ill as defined in the Mental Health Act of 1951 and the standards set by the Supreme Court in this case, it is hereby Ordered that proceedings in this case shall continue and any additional reasons for a new trial shall be filed forthwith.". Exceptions thereto were dismissed after argument and a final order entered on March 29, 1956 affirming the earlier order. This appeal followed.

In construing The Mental Health Act of 1951 we stated in our disposition of the prior appeal (383 Pa. at p. 28) : ". . . the controlling factor is the degree or extent to which the mind is affected by the mental disorder and not the bare existence of symptoms which would induce a psychiatrist to diagnose a mental illness. . . .", and that the determinative issue is whether the illness so lessened the defendant's capacity to use his customary self-control, judgment and discretion as to render it necessary or advisable for him to be under care. This we held to be the standard which the Legislature promulgated to guide the commission and the court. The commission found the defendant had a mental illness and was a proper subject for commitment to a mental hospital. It does not appear that

the commission applied the standard prescribed by the Legislature, but as we said in the earlier appeal at p. 29: "Assuming the commission found appellant a proper subject for commitment under this standard, its findings while persuasive were nevertheless advisory only and not mandatory upon the court, for under Section 345(d) of the Act it is the court and not the commission which must be satisfied that appellant is mentally ill under the standard prescribed. It follows that the court in the instant case could have rejected, although not arbitrarily or capriciously, the commission's findings and conclusions and could have independently determined from the evidence that appellant's capacity to use his customary self-control, judgment and discretion had not been so lessened that it was necessary or advisable for him to be under care. . . .".

The appellant argues that the testimony of the witnesses connected with the Western State Penitentiary should not have been admitted. This argument is part and parcel of the major contention made at oral argument and in the brief of appellant's counsel that the defendant's conduct throughout as it bore on the exercise of his self-control, judgment and discretion, was a matter solely for interpretive determination by medical experts—a medical issue which the commission, two of the three members of which were qualified medical experts, conclusively decided. This contention flies in the face of all of our decisions. We have repeatedly and invariably held not only that testimony of laymen as well as experts is admissible in determining the mental status of a criminal defendant but that all of such testimony is for the consideration of the legal tribunal, be it court or jury, which has the ultimate determination of the issue: *Commonwealth v. Lance,* 381 Pa. 293, 113 A. 2d 290; *Commonwealth v.*

*Patskin,* 372 Pa. 402, 93 A. 2d 704; *Commonwealth v. Carluccetti,* 369 Pa. 190, 85 A. 2d 391; *Commonwealth v. Cavalier,* 284 Pa. 311, 131 A. 229; *Commonwealth v. Gearhardt,* 205 Pa. 387, 54 A. 1029; *Commonwealth v. Wireback,* 190 Pa. 138, 42 A. 542. As stated in *Commonwealth v. Carluccetti,* supra, quoting from *Commonwealth v. Cilione,* 293 Pa. 208, 142 A. 216: ". . . '. . . You do not have to be a psychiatrist to judge whether a man's actions are normal or abnormal. . . .' "

Under The Mental Health Act of 1951, as under the prior Act of July 11, 1923, P. L. 998, it is expressly provided that the court, not the commission, must be satisfied that the defendant's mental condition is such as to require his commitment to a mental hospital. The report of the commission is advisory only: *Commonwealth v. Patskin,* supra; *Commonwealth v. Ballem,* 386 Pa. 20, 123 A. 2d 728. As was stated in *Commonwealth v. Bechtel,* 384 Pa. 184 at p. 190, 120 A. 2d 295: ". . . Inquiries into the mental health or sanity of a prisoner whether made before trial or after conviction and before sentence are 'to inform the conscience of the judge'.": *Commonwealth v. Iacobino,* 319 Pa. 65, 178 A. 823; *Commonwealth v. Scovern,* 292 Pa. 26, 140 A. 611. In the instant case the court observed the defendant throughout his trial which lasted two weeks and at which he testified at length, examined and considered the evidence adduced before the commission which included testimony by the defendant and by medical experts, the commission's findings and report, heard the testimony of witnesses during defendant's incarceration at the Western State Penitentiary and determined that the defendant had suffered no lessening of his capacity to use his customary self-control, judgment and discretion.[1] We have thor-

---

[1] In referring to the two occasions reported by the commission of acute mental disturbance which "promptly subsided", the court

oughly reviewed the record and are convinced that the court did not abuse its discretion in reaching such conclusion.

The appellant also contends that the court erred in excluding certain evidence. As to this the record nowhere discloses that any request was made of the court to hear witnesses on defendant's behalf. At the completion of the testimony of the witnesses from the Western State Penitentiary at the hearing on December 12, 1955, counsel for defendant expressly stated that "The defendant has no testimony to offer, if the Court please." As before stated, the court advised defendant's counsel that the date of hearing for taking additional testimony would be fixed far enough in the future to afford opportunity for counsel to prepare any evidence which they might desire to produce at the hearing.[2] Therefore it is surprising to find in the

in its opinion states: "These two brief instances, which were in part at least stimulated by the stress of his confinement, of which there is no evidence of any reoccurrence in the record, can hardly be taken as indicative of any general lessening in defendant's capacity to use his customary self control, judgment and discretion. A repetition of such episodes could have been readily observed by anyone having close supervision of the defendant, with or without medical training, and the testimony of the prison guards who were in charge of the defendant and have had him under close supervision at all times shows no repetition of such episodes since August of 1954.".

[2] During the hearings before the commission, counsel for the defendant requested permission to present medical testimony before the commission "to insure examination by trained psychiatric personnel not employed by the Commonwealth of Pennsylvania." The Deputy Attorney General expressed the opinion that the request "goes to the proof of the competency and prejudice of the present commission and as such should be addressed to the court and not the commission." Defendant's counsel then stated it was not challenging the competency of the commission but requesting that testimony be received by a psychiatrist or psychiatrists not affiliated in any way with the Commonwealth "in any employer-

exceptions filed to the court's ruling of January 28, 1956 complaint that defendant should have been afforded but was denied an opportunity to submit additional evidence from medical experts. These exceptions could have been dismissed summarily. Assuming, however, that such a request was informally made, possibly during oral argument on the exceptions inasmuch as the court in its opinion indulgently considered the matter, the hearing of additional testimony was discretionary with the court as indeed is the appointment of a commission in the first instance (*Commonwealth v. Gossard*, 385 Pa. 312, 123 A. 2d 258, and cases cited therein) and we find no abuse of discretion. If the court were required to reopen the proceedings for the

employee relationship." The commission stated it would consider the request. The commission found the defendant a proper subject for commitment and apparently decided it did not require additional medical testimony to arrive at its conclusion. Counsel made no application to the court for the taking of additional testimony either before or after the commission filed its report. After consideration of the report and the record of the proceedings and testimony before the Commission, the court filed an opinion and order dated October 21, 1954, refusing commitment and directing that the criminal proceedings continue. In the course of its opinion the court referred to and approved the judgment of the commission in not calling additional medical witnesses. If defendant's counsel felt that the commission's conclusion should have been buttressed by additional medical testimony, they could have filed an appropriate exception. However they filed only a general exception which after argument thereon was dismissed by the court below in an extensive opinion and order filed February 9, 1955 to which again only a general exception was filed, and on the first appeal to this Court made no complaint regarding the action of the Commission in not receiving additional medical testimony. At no time did counsel for the defendant make any request whatsoever to the Court to present additional medical testimony on defendant's behalf but, contrariwise, after we remanded the case for reconsideration, the court below, as stated in the text of this opinion, went out of its way to afford opportunity for the introduction of additional testimony on defendant's behalf.

introduction of additional testimony by medical experts on defendant's behalf, by like token it would be obliged to hear additional testimony by medical experts offered by the Commonwealth in rebuttal. In fact there would be little power in the court to end the inquiry which could be indefinitely prolonged by the persistence and resourcefulness of counsel. The rights of the defendant as an offender on trial for an offense are not here involved. The inquiry is not an adversary proceeding to determine the guilt or innocence of the defendant but a collateral proceeding entirely apart therefrom to inform the conscience of the court as to the appellant's mental condition—not merely whether defendant had a mental illness or disorder in the opinion of psychiatrists or medical witnesses but, assuming that some mental illness existed, whether it so lessened his capacity to use his customary self-control, judgment and discretion in the conduct of his affairs and social relations as to make it necessary or advisable for him to be under care. This was for the evaluation of the court and the extent of the inquiry was within its discretion. It cannot be said that the wide scope of the court's inquiry, above outlined, which included consideration of the opinions of several impartial qualified medical experts, was insufficient to inform the conscience of the court as to the defendant's mental status under the test or standard prescribed by The Mental Health Act.

We are fully satisfied that the court did not commit any error of law or abuse its discretion in refusing to commit defendant to a mental hospital and in directing that the proceedings in the criminal action continue.

Order affirmed.

CONCURRING OPINION BY MR. JUSTICE BELL:

This appeal, taken before sentence and judgment and while defendant's motion for new trial has not been disposed of, is clearly interlocutory and should be quashed. If this defendant is committed before his motion for a new trial is disposed of, it may be many years before he appears in Court for a redetermination of his sanity or mental condition, or for the disposition of his motion for a new trial, or for a new trial if a new trial is granted. The net result of such delay may well be the obstruction or defeat of justice because of the death, resignation or retirement of the trial Judge or stenographer, or because of the absence or death or dimming recollections of witnesses. Dilatory or delaying tactics are well known devices employed by criminals to defeat justice and such tactics or motions should be rejected by the Courts whenever reasonably possible.

If an appeal is taken after defendant's motion for a new trial has been dismissed and judgment of sentence has been entered on the verdict, defendant can then raise all questions he desires, including the lower Court's refusal to commit him to an institution. This has always been the salutary policy in Pennsylvania. The general rule is long and well established that a defendant has no standing to appeal, even after conviction, where no sentence or other final judgment has been entered against him: *Commonwealth v. Hall,* 173 Pa. Superior Ct. 285, 98 A. 2d 386; *Commonwealth v. Hicks,* 173 Pa. Superior Ct. 395, 98 A. 2d 478; *Commonwealth v. Trufley,* 170 Pa. Superior Ct. 200, 85 A. 2d 622; *Commonwealth v. Graham,* 170 Pa. Superior Ct. 343, 85 A. 2d 632; *Commonwealth v. Feldman,* 159 Pa. Superior Ct. 3, 46 A. 2d 332; *Commonwealth ex rel. Holly v. Ashe,* 368 Pa. 211, 82 A. 2d 244. See also, Act of March 31, 1860, P. L. 427, §57.

In *Commonwealth ex rel. Holly v. Ashe*, 368 Pa., supra, the Court said (page 218) : " 'appeals may not be taken in criminal proceedings where judgment of sentence has not been passed.' "

In *Sullivan v. Philadelphia*, 378 Pa. 648, 107 A. 2d 854, the Court said: "Even with the consent of all interested parties, appellate jurisdiction of an interlocutory order or decree may not be assumed: Stadler v. Mt. Oliver Borough [373 Pa. 316, 95 A. 2d 776]. The evident policy of the law in such regard is to preclude piecemeal determinations and the consequent protraction of litigation."

There are no extraordinary circumstances, no jeopardy of basic human rights, to justify taking the present case out of the aforesaid general rule.

Since the decision in *Commonwealth v. Moon*, 383 Pa. 18, 117 A. 2d 96, this Court decided the case of *Commonwealth v. Novak*, 384 Pa. 237, 120 A. 2d 543, which I believe was inadvertently overlooked by the majority. In the *Novak* case this Court decided that an order of the lower Court dismissing the petition of a defendant to commit him to a mental hospital—which petition was filed after indictment but *before trial*— was interlocutory and not appealable. The *Novak* case, in my judgment, in principle rules the instant case since there is no difference in principle between the dismissal of a commitment petition presented before trial and one presented during trial or after trial but before sentence.

To allow this interlocutory and unnecessary appeal will establish a precedent—a bad precedent—for an almost endless series of commitment petitions followed by interlocutory appeals by defendants (1) during trial, and (2) after trial but before sentence. These delaying tactics will hamper and for the aforesaid reasons will often defeat justice.

If the appeal is not quashed, I would concur in Justice CHIDSEY'S able opinion.

___

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

On January 13, 1954, Norman W. Moon was called to the bar of the court in the Court of Quarter Sessions of Warren County to explain why he had failed to pay $30 a week to his wife, as ordered, which order had been affirmed by the Superior Court of Pennsylvania. As he approached the bench he whipped from beneath his belt a 45 Colt pistol and opened fire on Judge ALLISON D. WADE who was presiding. He also turned his blazing weapon on the District Attorney who, however, was able to escape from the room unharmed. A bullet whizzed by Mrs. Bernice Seavy, the Court reporter, as the Judge, mortally wounded, collapsed to the floor moaning: "He shot me, he shot me." Moon fled from the courtroom, leaped into a car and sped away, followed by State Police who had been summoned by the District Attorney from a telephone. After a chase of some 10 miles, the police succeeded in puncturing a tire of Moon's car which came to a stop, and as the police closed in on the fugitive he shot himself in the throat. When he recovered from this wound, he was tried for the murder of Judge Wade who had died within a few minutes after two bullets had penetrated his chest. Moon was found guilty of murder in the first degree and the jury fixed the penalty at death.

On July 1, 1954, the Court of Oyer and Terminer of Warren County appointed a Sanity Commission, under the provisions of The Mental Health Act of June 12, 1951, to inquire into Moon's mental state. The Commission, composed of two physicians and an attorney, unanimously concluded, and so reported to the Court

that: "a. Norman W. Moon is in fact mentally ill. b. Norman W. Moon's mental illness is that of dementia praecox of the paranoid type. c. This illness is chronic and continuing. d. Norman W. Moon is a proper subject for commitment to a mental hospital."

The Warren County Court declined to follow the recommendation of the Sanity Commission and the defendant appealed to this Court. We sent the record back with instructions for a re-evaluation of the Sanity Commission's report, plus the taking of any additional testimony the lower Court deemed in order. The Warren County Court took further testimony, reappraised the Commission's report and again refused to commit Moon to a mental institution. The case is now before us for the second time.

The majority of this Court is of the opinion that the lower Court was justified in its conclusion. I am of a contrary view. Although the lower Court refuses to hospitalize the defendant Moon, it admits that the Sanity Commission was "well justified" in finding that the defendant was "afflicted with dementia praecox of the paranoid type."

Mental illness is defined in Section 102 of the Act of 1951, 50 PS 1072, as follows: "(11) 'Mental illness' shall mean an illness which so lessens the capacity of a person to use his customary self-control, judgment and discretion in the conduct of his affairs and social relations as to make it necessary or advisable for him to be under care. The term shall include 'insanity', 'unsoundness of mind', 'lunacy', 'mental disease', 'mental disorder', and all other types of mental cases, but the term shall not include 'mental deficiency', 'epilepsy', 'inebriety', or 'senility', unless mental illness is superimposed."

The Court below has said that while the question as to whether or not the defendant's capacity to exer-

cise his customary self-control, judgment and discretion in the conduct of his affairs was lessened by mental disorder is largely a medical question, it is a question that can be intelligently answered not only by psychiatrists and doctors but by laymen who observed the conduct of the subject. Further, that the lay witnesses in this case, notably the prison guards who had seen the defendant in prison, convinced the Court that Moon's capacity for customary self-control, judgment, and discretion had not been lessened enough to require his hospitalization.

The Court's reasoning in this respect is an enigma. It calls in experts to solve a problem and then discards their conclusions for the opinions of passersby. Speaking of the chairman of the Sanity Commission, the lower Court said: "the Court has full faith in the competence of Dr. Israel. His qualifications (Sanity Commission record page 3) include membership in the Warren State Hospital staff for twenty-eight years, Superintendent for nineteen years, Fellow of the American Psychiatric Association for more than twenty years, Member of the Pittsburgh Neuro-Psychiatric Association, the Pennsylvania Neuro-Psychiatric Association, the Pennsylvania Medical Association, Warren County Medical Association, and President of the Pennsylvania Neuro-Psychiatric Association. The Court also has faith in his integrity and is fully confident that he performed his duties as a member of the Commission objectively and fairly. He is incapable of being influenced by prejudice. The Court has been personally acquainted with Dr. Israel for twenty years." The Court went on in its Opinion: "The Court has equal faith in the integrity of the other two members of the Sanity Commission and in their qualifications and ability to fulfill their duties as members of the Commission. The qualifications of Dr. William

S. Walters (Sanity Commission Record page 3) show him to be a graduate of the University of Pennsylvania Medical School licensed to practice in Pennsylvania, and engaged in the general practice of medicine in Warren, Pennsylvania, since 1947; a member of the American Medical Association, the Pennsylvania State Medical Association and the Warren County Medical Association. The Court believes Dr. Walters to be particularly well qualified for examination and report on the condition of the defendant because Dr. Walters 'attended Norman Moon as a medical man from the start.' He 'was assisting Dr. Cashman (surgeon) at the table when he (defendant) first came in on January 13th and treated him during his stay in the Warren General Hospital.' After defendant was transferred from the Warren General Hospital to the Warren County Jail on January 29, 1954 (Sanity Commission Record page 7) Dr. Walters saw him 'perhaps weekly for about a month, and then the visits tapered off to anywhere between one and three weeks except upon the call of the jail to come over and administer in minor problems that came up about his diet, bowels, sedation, many things.' (Sanity Commission Record page 46). Dr. Walters also examined him when he caused trouble on two occasions as a prisoner in the Warren County Jail (Sanity Commission record pages 46, 47 and 48). The third member of the Commission, R. Pierson Eaton, Esq., has been personally known to the Court for twenty years. He was admitted to practice before the Supreme Court of Pennsylvania and the courts of the 37th Judicial District in 1927 and since that time has been engaged in the active practice of the law in Warren, Pennsylvania. He is a member of the Federal Bar and of the Pennsylvania and Warren County Bar Associations. The Court is well satisfied with the qualifications of the members of the Sanity

Commission, and with the investigation made by them."

It is difficult to conjure up a more qualified board of inquiry than the one which has received so glowing an accolade from the Court which appointed it. But this accolade has been torn from the brow of the Commission and cast into discard while the Court which conferred it takes up the recommendation of prison guards. The action of the Court can be compared to the president of an airline company hiring highly specialized aeronautical mechanics to examine a grounded plane to determine what, if anything, is wrong with it, and then calling upon bystanders to decide whether it should take to the air. It is like having a doctor examine a patient to determine whether he has appendicitis and then asking the janitor to decide if the appendix should be removed.

The Warren County Court said that the "Defendant's symptoms as found by the Commission, indicate by their nature that the diagnosis was purely medical and that when the Commission found the defendant to be 'mentally ill' it was using the term in a purely medical sense and not in the light of the definition of 'mental illness' as contained in the Act." But the mental illness defined in the Act is exactly the mental illness which the Commission found. The Commission found that the defendant was suffering from dementia praecox of the paranoid type, that this illness was "chronic and continuing," and that the patient should be committed to a mental hospital. A person who should be committed to a mental hospital has certainly lost, in the words of the Act, the capacity "to use his customary self-control, judgment and discretion in the conduct of his affairs and social relations."

The lower Court does not attack the findings of the Commission. In fact, as already pointed out, it says

that the Commission was well justified as a medical matter in reaching its conclusion and added sententiously that "no doctor worthy of the name could make such a diagnosis without recommending treatment." The two doctors on the Commission were not only worthy of the name; they were worthy of the highest commendation, which the Court did not hesitate to bestow on them.

The Court of Oyer and Terminer of Warren County has extended the periphery of its powers under The Mental Health Act, and this Court has done nothing to shrink that unwarranted assumption of enlarged jurisdiction. The Act says that: "If the Court is satisfied that the person sought to be committed is mentally ill . . ., it shall order the commitment or transfer of such person to a mental hospital . . ." (50 P.S. 1225.)

It is not the Court's province or duty to make a finding in the matter. It is not called upon to conduct a medical examination, to gather facts, interview people, study diagnoses, and project prognoses. It has approbatory and disapprobatory powers, but those powers are not to be exercised arbitrarily. It does have the conscientious obligation to be satisfied that what the Commission recommends is proper and just, but in reaching that satisfaction it may not indulge in caprice or overfastidiousness. It cannot accept with full faith the conclusions of the Board it has appointed and then reject its recommendations without assigning a better reason than the one it has so far presented.

The Court apparently used an apothecary's scale in weighing the value of the medical findings, but piled high on an avoirdupois scale the opinions of non-medical witnesses. But if it intended to be influenced to such a considerable degree by the opinions, observations, and surmises of lay and non-technical persons such as prison guards, then it should have considered

the entire lay picture of the storm in which Norman W. Moon, like the deranged King Lear, was the central figure. That picture reveals Moon as a madman, as one possessing a mind as capable of being upset by the slightest winds of mischance and misfortune as a frail craft at the mercy of a typhoon.

No one but a person entirely bereft of the rudder of reason could have committed the horrible deed of which Moon was the executant. No reason, no rationale exercisable by even the lowest aboriginal life, could justify his destruction of Judge ALLISON D. WADE. If Norman Moon is to be executed for the killing of Judge WADE, then a thousand executions would not be enough to expiate the monstrous assassination of so good a man, so excellent a judge, so kind and gentle a Christian. We who live in Allegheny County got to know Judge WADE very well through the years because he often came to our courts as a visiting judge. Here he won without effort the warm admiration of the lawyers, the full respect of the court attaches, the confidence and trust of all litigants who came before him, and the affectionate regard of the judges. He was a gentleman and a jurist who could have been the central character of a book portraying the virtues, the graces, the kindness, understanding, philosophy, and amiable cheer of the "good old country judge."

Judge WADE could not have been unaware of his munificent spirit, for he was ever ready and eager to add another act of goodness to the countless he had performed throughout his life of unceasing benevolence. The most shocking sensation which must have struck him as the cruel bullets felled him was surprise that anyone should want to do him harm. Thus, he cried out in hurt astonishment: "He shot me. He shot me."

I repeat that if Moon is to expiate his brutal deed, regardless of mental irresponsibility, it is a useless ex-

penditure of time to have sanity commissions and judges pass upon his condition, but if we are to be true to the standards of the law and be guided by justice and not emotional prejudices, it is impossible to look upon Norman W. Moon as anything but a mentally ill person. His violent aggression had no rhyme, reason, purpose or objective. If he rationalized his act as one of justifiable revenge, he irrationally endeavored to deprive himself of the only satisfaction which could be experienced from the gratification of such a base passion, since he tried, immediately after the act of supposed revenge, to kill himself. One who plans an atrocious deed of revenge, plans also to enjoy the sadism of revelling in the knowledge that the object of his hatred is dead or suffering some mortal agony. But Moon was apparently as willing that he should die himself as that Judge WADE and the others he shot at should die.

Moon had no quarrel with the court reporter, Mrs. Bernice Seavy, but he tried to kill her also. He had no particular grudge against the District Attorney but he aimed fiery bullets at him. As a matter of fact, he had no special animosity against Judge WADE because it was only chance which brought the Warren County jurist before Moon's blazing pistol first. Moon had apparently set out to kill other judges too.

When the Superior Court affirmed the Warren County order of support against Moon, he proceeded to the office of the Prothonotary of the Superior and Supreme Courts in the City-County Building, Pittsburgh, and asked for the names of the judges of those tribunals. He learned that two of the appellate court judges had chambers close to the Prothonotary's Office. He set out at once for the chambers of the writer of this Opinion, only two or three doors removed from the Prothonotary's Office. He failed to see the pres-

ent writer, whose door was open to all visitors, only because on that day he was in Philadelphia.

Moon then proceeded to the chambers of Judge GUNTHER who fortunately also was absent. Although Judge GUNTHER had sat on the Superior Court which had heard Moon's case, the present writer had not had any association whatsoever with the Moon case. But it would appear that at that moment all judges were fair game for Moon's weapons of blind, maniacal hatred against all officialdom in the law.

Before the tragic encounter in Warren, Moon had travelled to Connellsville, stopped in Pittsburgh, drove back to Warren, and had generally threshed about in a frenzy of geographical gyrating as erratic as were his furious and frantic actions in Judge WADE's courtroom.

If facts spell out intentions, or lack of them, and if circumstances are more convincing than words, it is clear that on January 13, 1954, and apparently for some time prior to that date, Moon was a man amuck. The doctors who examined him at length, the experts who studied his history, the scientists who probed into his attitudes, moods, and characteristics, came to the conclusion that the hinges on the door of Moon's intellect were shattered and that only medical care and treatment in a mental hospital might repair, if not wholly refashion, the delicate swivels on which one's whole life turns. The lower Court ignored these authoritative findings, preferring to be guided by the ideas, estimates, and free-and-easy views, no matter how honestly expressed, of prisons guards who were necessarily limited in their appraisement of the subject of whom they spoke. The lower Court, with every conscientious desire to do justice, would have considerable difficulty in overlooking the horrible reality that

a brother judge had been shot down in the very temple of the law.

But it is strange that this Court, having before it the authoritative, documented and evidence-supported report of the Sanity Commission, should regard it as of less significance than the testimony of members of the prison staff who testified that the defendant wrote letters, read books, received visitors, and seemed calm in his surroundings. It might not be amiss to say in this respect that even a Bengal tiger must at times rest in the shade of a jungle tree. Even the fiercest storm abates its fury at intervals, only later to rise to more violent demonstration of uncontained wrath. But what of the homicidal convolutions in the tiger's brain? What of the deviative grooves in Moon's brain? What of the broken electric wire which at any moment may swing into the path of innocent pedestrians and electrocute them on the spot?

The brain specialists in this case are more qualified to anticipate what a victim of dementia praecox may do than untrained lookers-on who merely observe the outer manifestations of a man caged within the confines of a stone-and-iron prison.

There is another reason why the Warren County Court's decision should be reversed, a reason, incidentally, which the Majority of this Court has treated rather cavalierly. The Majority Opinion makes the statement: ". . . it is surprising to find in the exceptions filed to the court's ruling of January 28, 1956 complaint that defendant should have been afforded but was denied an opportunity to submit additional evidence from medical experts. These exceptions could have been dismissed summarily. Assuming, however, that such a request was informally made," etc. There does not need to be an assumption in the matter. On August 5, 1954, Attorney Braemer, representing the de-

fendant, made the following request to the Sanity Commission: "BY MR. BRAEMER: At this time I also would like to request permission to present before the Commission testimony, expert medical testimony, regarding the condition of Norman W. Moon since the date of conviction. To clarify this request, we would like the opportunity of having Norman W. Moon examined by competent psychiatric personnel and offer the testimony of such psychiatrist before the Commission."

Attorney Lawley objected on behalf of the Commonwealth and suggested that the Commission confer with the Court on the matter. Attorney Eaton, Chairman of the Commission said: "That request will be considered by the Commission and a report made to the Court." Mr. Lawley said that the request "goes to the proof of the competency and prejudice of the present Commission and as such should be addressed to the Court and not the Commission."

The record of this colloquy went to the Court, and, after considering it, the Court said on October 21, 1954: "Defendant's counsel requested the Commission for leave to have the defendant examined by another psychiatrist, not employed by the Commonwealth, and to have his testimony as to defendant's mental condition heard. This request was refused by the Commission. The Court has faith in the Commission and believes that if the Commission had concluded additional psychiatric testimony was required to enable it to make a full, complete and comprehensive report, it would have arranged for and heard such additional testimony. The Commission did not feel such was required, and the Court, on consideration of the record of the testimony taken before the Commission and its report, is satisfied of the judgment of the commission on this point." The Warren County Court thus took full responsibility for denying the defendant an opportunity

to present independent expert medical testimony on behalf of the defendant.

In its present decision, the Majority of this Court goes further than did the Warren County Court. Whereas the lower Court rested its refusal of further medical testimony on the Commission's judgment, this Court sees a great imposition being foisted on the lower Court if it were required to hear additional medical testimony. The Majority Opinion sums it up as follows: "If the court were required to reopen the proceedings for the introduction of additional testimony by medical experts on defendant's behalf, by like token it would be obliged to hear additional testimony by medical experts offered by the Commonwealth in rebuttal."

I fail to see the validity of this observation. I don't believe that if the defendant offered additional medical testimony and the Court were then obliged to hear additional testimony offered by Commonwealth medical experts in rebuttal, that this unspectacular procedure would cause the courthouse to collapse. Suppose the Commonwealth did present rebuttal testimony, who would be harmed by that presentation, so long as the evidence was relevant and enlightening? The Court has the duty to hear and appraise evidence, no matter how much, so long as it is competent and assists the judge in solving the problem submitted to him for adjudication. It is not enough merely to finish a case. It must be finished so that the aims of justice are met.

The Majority Opinion does not stop with complaining about the burden the Court would have to sustain in listening to testimony the Commonwealth might present in rebuttal. It goes on and says: "In fact there would be little power in the court to end the inquiry which could be indefinitely prolonged by the persistence and resourcefulness of counsel." This is

a malapert non sequitur. Any proposition can be made absurd by exaggerating it beyond what is normal and what is to be expected. Why wouldn't the Court have the power to end an inquiry which was stretching out into infinity and perpetuity? And why must defense counsel be satirized because he is seeking to obtain for his client the best medical advice possible? Why must he be subjected to contumely because he is trying to save the life of a person he believes to be mentally ill? Why must he beg for what is his right, as well as his duty to perform?

I dissent.