364 A.2d 902

**COMMONWEALTH of Pennsylvania,
Appellee,**

**v.**

**Keith Mason KNIGHT, Appellant.**

**COMMONWEALTH of Pennsylvania,
Appellee,**

**v.**

**Bruce Edward POWELL, Appellant.**

Supreme Court of Pennsylvania.

Argued May 3, 1976.

Decided Oct. 20, 1976.

58

60

Robert E. Campbell, Public Defender, Gary E. Hartman, Asst. Public Defender, Gettysburg, for appellant.

Oscar F. Spicer, Dist. Atty., Gettysburg, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

EAGEN, Justice.

In a joint trial, Bruce Edward Powell and Keith Mason Knight were both convicted of two counts of murder of the first degree and two counts of conspiracy to commit murder. Powell and Knight were both sentenced to two consecutive terms of life imprisonment following the denial of post-verdict motions. These appeals from the judgments of sentence followed.

Both Knight and Powell assert four identical assignments of error as a basis for the granting of a new trial.[1] Powell asserts one additional assignment of error not argued by Knight. For the reasons stated herein, we affirm the judgments of sentence.

### I.

On April 16, 1974, Knight and Powell walked into the Frederick City Police Department in Maryland and informed an officer they had been involved in a double killing in Pennsylvania. Subsequently, Knight and Powell each made a statement to another officer describing the killings. Knight's statement admitted his own

---

1. Although neither Knight nor Powell has challenged the sufficiency of the evidence to support the verdicts, an independent review of the record reveals sufficient evidence exists to support the guilty verdict returned by the jury.

participation and also implicated Powell. The latter's statement admitted his involvement and said Knight participated in the killings. These statements were offered as and admitted into evidence at the joint trial without modification, that is, each statement as admitted into evidence made reference to the declarant's coparticipant by name. Later, Knight and Powell made separate statements to the Pennsylvania State Police which incriminated the declarant and also his coparticipant. When testimony recounting these statements was introduced as evidence at trial, the testimony was modified at the court's direction so as to delete the name of the declarant's coparticipant and substitute the words "the other individual named."

Initially, we agree with the trial court's post-verdict assessment as to the effect of the modification of the latter testimony recounting the statements given to the State Police: " . . . no one could sit on the jury . . . and not understand that each defendant was referring to the other!" Thus, we shall treat all of the statements introduced into evidence as having directly incriminated both the declarant and his coparticipant.

Both Knight and Powell assert that even if the statements were properly introduced against the declarant,[2] since each statement incriminated both the declarant and his coparticipant, the introduction of the statements in a joint trial was a denial of their Sixth Amendment right

2. Both Knight and Powell assert each of their own statements was improperly introduced into evidence because the Commonwealth failed to meet its burden of showing each knowingly, intelligently, and voluntarily waived his constitutional rights after *Miranda* warnings were given. A hearing on a motion to suppress evidence of the statements was held in Adams County, the site of the crimes, prior to the granting of the defendants' motion for a change of venue. We have examined the evidence presented at that hearing in accordance with our standard of review, *Commonwealth v. Goodwin*, 460 Pa. 516, 333 A.2d 892 (1975); *Commonwealth v. Fogan*, 449 Pa. 552, 296 A.2d 755 (1972); *Commonwealth v. Bundy*, 458 Pa. 240, 328 A.2d 517 (1974), and have determined this assertion is without merit.

under the Federal Constitution to confront the witnesses against them as interpreted in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

Assuming the instant facts present a violation of Knight's and Powell's right to confront the witnesses against them, and thus the admission into evidence of the statements constituted error as to the declarant's coparticipant,[3] we believe that, under the circumstances of this case, the error was harmless beyond a reasonable doubt. Therefore, a new trial is not required on this basis.

In *Brown v. United States*, 411 U.S. 223, 231, 93 S.Ct. 1565, 1570, 36 L.Ed.2d 208 (1973), the Supreme Court of the United States stated:

> "Upon an independent examination of the record, we agree . . . that the *Bruton* errors were harmless. The testimony erroneously *admitted was merely cumulative of other overwhelming and largely uncontroverted evidence properly before the jury*. . . . We reject the notion that a *Bruton* error can never be harmless." [Citations omitted. Emphasis added.]

What was said in *Brown*, supra, is equally applicable instantly. Both Knight's and Powell's statements were in substance and in specifics virtually identical in accounting in detail the killings, and each statement was admissible against the declarant. Supra n. 2. As such, the statements of each declarant in so far as it implicated the coparticipant was merely cumulative of what the coparticipant's statements related. Further, the Commonwealth's other evidence was uncontroverted as to events described in each of the statements.

Furthermore, as the trial court in its opinion following postverdict motions noted, the Commonwealth's other evidence was overwhelming. The testimony of an on-the-

3. Compare *Bruton v. United States*, supra, with *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970).

scene witness, Tony Williams, provided a detailed account of the events prior to and during the killings.[4] Finally, police testimony which was based on an investigation of the killings fully supported in both substance and detail Williams' account of the killings, as well as, Knight's and Powell's statements in so far as each statement incriminated the declarant.[5]

4. Williams testified that he knew both Knight and Powell and that he was familiar with the house trailer in which Knight, Knight's mother, Mrs. Shorb, and Knight's step-sister, Rebecca, who was six at the time of the killings, resided and in which Mrs. Shorb and Rebecca were killed. He also testified that the trailer was divided inside into two parts by plastic and colored paper in order to provide a room for Knight and separate quarters for Mrs. Shorb and Rebecca; that he went to Knight's room prior to the murders where he met Knight and Powell; that they engaged in normal conversation; that shortly thereafter Knight said he and Powell were going to kill someone and that Williams would see them carry the bodies out of the trailer; that at 10:55 p. m. Knight and Powell synchronized watches; that he then stated he wished to leave but Powell indicated he had to stay; that Knight and Powell each had a piece of rope; that at 11:00 p. m. Knight and Powell passed through the plastic and paper which they had torn and entered the area in which Mrs. Shorb and Rebecca were sleeping; and, that, in Williams' words:

"I heard Mrs. Shorb say 'Keith what are you doing?,' and I heard some gagging, and a couple seconds later, I heard the little girl [Rebecca] say 'Mommy, mommy!" and then some gagging . . . ."

5. The County Coroner testified that Mrs. Shorb's and Rebecca's bodies when first seen by him between 5:30 a. m. and 6:00 a. m. on April 16, 1974, were clad in night attire. He further testified that Mrs. Shorb's body had a rope wrapped around it; that Rebecca's neck was marked from a rope or similar item; that both had died because of asphyxiation due to strangulation; and that both strangulations were committed by wrapping clothesline around the neck of each victim. Finally, he testified death in this manner could not have been self-inflicted or accidental.

Although she indicated she did not take the remark seriously at the time it was made, Barbara Frazer testified Knight had stated he had had an argument with his mother over the house and he would kill his mother. This statement by Knight was made approximately two weeks before the killings.

A police officer from Frederick City, Maryland, testified that she obtained a piece of rope from Powell when Knight and Powell surrendered and that she turned the rope over to the Pennsylvania State Police. A Pennsylvania State Police officer testified he obtained a piece of rope from around the throat of Mrs. Shorb. Another piece of rope was recovered at Knight's resi-

We, therefore, hold that, assuming *Bruton,* supra, was violated and thus error resulted because each declarant's statement incriminated the declarant's coparticipant, the error was harmless beyond a reasonable doubt. *Brown v. United States,* supra.

## II.

Knight and Powell assert they were denied their constitutional right to a public trial. Immediately prior to calling Tony Williams to testify, a side-bar conference was held. The district attorney informed the court an attorney for Williams' father had requested the courtroom be cleared of spectators before Williams began to testify. Both Knight and Powell objected. Following some discussion, the court overruled the objection and issued an order excluding all spectators with the exception of the press and a group of law students who were observing the trial.

Initially, we agree with the position, advocated by Knight and Powell, that no showing of prejudice is required where a violation of an accused's right to a public trial is asserted. *United States v. Kobli,* 172 F.2d 919 (3d Cir. 1949); *United States ex rel. Bennett v. Rundle,* 419 F.2d 599 (3rd Cir. 1969); 3 Wharton's Criminal Procedure, 12th ed., § 439. But the right to a public trial is not absolute; rather, it must be considered in relationship to other important interests.[6] *United States v. Kobli,* supra; *United States ex rel. Smallwood v. La-Valle,* 377 F.Supp. 1148 (E.D.N.Y.1974) aff'd 2 Cir., 508 F.2d 837, cert. denied 421 U.S. 920, 95 S.Ct. 1586, 43 L.

---

dence. All three pieces of rope were analyzed by an expert employed by the Pennsylvania State Police and he testified all three pieces of rope were of the same type.

6. Such other interests include the orderly administration of justice, the protection of youthful spectators, *United States v. Kobli,* supra; and the protection of a witness from embarrassment or emotional disturbance. *United States ex rel. Smallwood v. La-Valle,* supra.

Ed.2d 788. In considering such other interests, a court must assess all of the circumstances to determine if they present a situation in which an exclusion order is necessary. If the court determines a necessity exists, it may then issue an exclusion order; but the exclusion order must be fashioned to effectuate protection of the important interest without unduly infringing upon the accused's right to a public trial either through its scope or duration.[7] *United States ex rel. Smallwood v. LaValle,* supra; *United States v. Kobli,* supra at 923; and see generally 3 Wharton's Criminal Procedure, 12 ed. § 439; 48 A.L.R.2d 1436 (1956). Ultimately, the determination of whether to exclude spectators, as well as the determination of the scope and duration of an exclusion order, must be left to the sound discretion of the trial court because it alone is sufficiently close to the circumstances to apprehend fully the subtleties that may be present.[8] See generally, 48 A.L.R.2d 1436, 1450, § 8. Thus, only if a trial court abused its discretion in issuing an exclusion order or in fashioning the order will reversible error be found on appeal. Therefore, we must determine: (1) whether the court abused its discretion in issuing the exclusion order; and (2) if it did not, whether it abused its discretion in fashioning the scope and duration of the order.

█ Powell and Knight argue the record does not establish a need for an exclusionary order. We disagree.

7. For example, an exclusion order which is designed to protect youthful spectators from testimony which may corrupt their morals is constitutionally infirm if it excludes the entire public rather than the *identifiable class* to be protected. *United States v. Kobli,* supra. On the other hand, an exclusion order which is designed to protect a witness from emotional trauma will not necessarily be constitutionally infirm if it excludes the entire public for a limited period of time. *United States ex rel. Smallwood v. LaValle,* supra; *United States v. Kobli,* supra at 423.

8. For example, the trial court is in position to assess demeanor which in turn may indicate fear, nervousness, and confusion in a witness, where an appellate court is not.

The record clearly establishes that Williams was only fourteen years of age at the time of trial; that at thirteen he was ordered to remain at the scene of a double killing; that the killings involved the mother and sister of one of the defendants; and that the sister was only six years of age at the time of the killings. Further, the Williams family had communicated to the court concern for Tony's emotional well-being through an attorney. The attorney had advised the court that Williams had suffered and was still suffering emotional trauma from his experience. Furthermore, the court was advised the entire Williams family had moved from the area in which the killings had taken place because of the effect the experience had on "Tony." The attorney had asked the court to consider these facts when Williams was called to the stand.

Both defense counsel were advised at the time of objection of the fact that the family attorney had communicated with the court. Yet, when counsel objected they did so generally and did not challenge or even ask to know the facts which caused the family such concern that they would contact an attorney to communicate with the court. If counsel had reason to doubt Williams would have difficulty testifying because of his emotional state, they should have requested an in-camera hearing to question Williams concerning his ability to testify with the spectators present. We specifically reject the notion that the trial court was required to withhold action on the request for the exclusion order until Williams was on the stand and manifested he was unable to testify. Such a position would not only subject the witness to further emotional trauma which was sought to be avoided, but it would further the possibility that the witness would not be able to testify.[9]

9. Had the trial court required Williams to attempt to testify in open court without issuing an exclusion order, it might well have resulted in an ordeal which could have rendered Williams unable to testify even after the order did issue. Thus the interest in

Finally, we note that the trial court's assessment of the facts necessitating an exclusion order to protect Williams from further emotional trauma was subsequently shown to be correct. After the exclusion order issued and William began to testify, he encountered a great deal of difficulty in testifying and had to be urged numerous times by the court and counsel to speak audibly. Further, the trial court noted it was quite apparent when Williams began to testify that he was under a great deal of emotional stress.

Under such circumstances, the trial did not abuse its discretion in determining necessity existed to warrant the issuance of the exclusion order.

Nor do we find any abuse of discretion in the scope and duration of the order.

The scope of an order in situations where the interest is to protect a witness from emotional disturbance may be broader than in other situations. Thus, it has been held that the entire public may be excluded in order to protect a witness. *United States ex rel. Smallwood v. LaValle,* supra. And see 48 A.L.R.2d 1436, 1450, § 8. Yet, instantly the court did not go that far. Rather, the court exempted the press and law students. These exemptions served to protect the interests underlying Knight's and Powell's right to a public trial. Both groups could be expected to act as a restraint against judicial power, and the press would be helpful in reporting matters to the public generally so that persons having knowledge of the events might voluntarily come forward and testify. *United States v. Kobli,* supra at 921; *United States ex rel. Bennett v. Rundle,* supra at 606. Moreover, the classes of individuals exempted are reasonably related to the Court's concern with protecting the youthful witness. As Williams related the events involved in these killings,

pursuing justice through a public trial and the interest in protecting the witness from unnecessary trauma would have been thwarted.

both classes of individuals could have been expected to act with restraint and thereby avoid the possibility of outcries and the like which would have caused Williams further trauma and thereby have impaired his ability to testify.[10]  Thus, the scope of the order struck a commendable balance between the right to a public trial and the protection of the youthful witness.  Finally, the duration of the order was clearly permissible since it lasted only during the testimony of Williams.  Thus, the court did not abuse its discretion in fashioning the scope and duration of the exclusion order.

Since no abuse of discretion occurred, we reject Knight's and Powell's assertion that they were denied the right to a public trial.  Our ruling finds additional support in that the trial did not even begin to approach the star chamber type of proceeding which a public trial attempts to avoid.  *United States ex rel. Bennett v. Rundle* supra; *Commonwealth ex rel. Paylor v. Cavell*, 185 Pa.Super. 176, 138 A.2d 246 (1958); allocatur denied. To the contrary, the trial was open and free of any judicial abuse.[11]

10.  The press could be expected to act with greater restraint because of experience; the law students because of education and an understanding of the judicial process.

11.  In a related argument advanced by Powell only, he asserts that the scope of the order was impermissible because it excluded his brother and sister.  Powell cites *Commonwealth ex rel. Paylor v. Cavell,* supra, in support of his position.  There the Superior Court stated:  " .  .  .  at the very least an accused is entitled to have his friends, relatives and counsel present."  We agree an order should generally not exclude the family and friends of an accused, see *Commonwealth v. Burton,* 459 Pa. 551, 330 A.2d 833 (1975), but we need not now determine whether relatives and friends can ever be excluded because of the circumstances here involved.  A trial court cannot be expected to know who are the relatives and friends of an accused without being informed, and thus the court instantly could not have been expected to know Powell's brother and sister were affected by the order.  Nor could the court have been expected to state its exclusion order by including a phrase to exempt family and friends because persons not even remotely connected to Powell might have then remained and the court would have had no way of knowing

## III.

During the trial, both Knight and Powell raised the issue of their mental capacity through cross-examination of police officers, specifically, each put in issue his mental capacity to commit the crimes, to form specific intent to commit murder of the first degree, and to effectively waive his constitutional rights prior to giving statements to police. Each did so by developing on cross-examination certain peculiar behavior on his part while in police custody.

After the mental capacity of Powell and Knight was raised, the district attorney in questioning a Pennsylvania State Police officer, who had gone to Frederick, Maryland, in the early morning hours of April 16, 1974, asked if he had given Knight and Powell *Miranda* warnings from a standard form before questioning them. The officer responded he had done so and also had gone into more detail because of the seriousness of what was alleged and because information regarding peculiar behavior by Knight and Powell at the time they surrendered had been conveyed to him. In concluding his long narrative response to the question by the district attorney, the officer stated:

> "I was satisfied with Mr. Knight and both with Mr. Powell, that they knew what was heppening. [sic] They knew what they did. And I was satisfied that they knew when they did it, they knew what they were doing . . .."

if they were in fact friends and relatives. Nor can it be expected that a court will conduct a *voir dire* with spectators; to the contrary, assuming the circumstances could not or did not justify the exclusion of Powell's relatives, counsel should have brought to the attention of the court the fact that relatives were present and informed the court who they were so that the court could avoid the possibility of error in excluding them. *Commonwealth v. Burton*, supra.

Counsel for both Knight and Powell objected and moved for a mistrial.[12] Following some discussion and a brief recess during which the trial court reviewed the law related to the issue, the court ruled that the testimony was admissible even though it constituted the expression of an opinion by an non-expert as to mental capacity. But the court directed the district attorney not to pursue the matter until the defense was presented and the complete nature of the defense ascertained. No further reference to the opinion expressed by the officer was made during the trial.

Knight and Powell assert the remark of the officer constitutes reversible error because a non-expert may not express an opinion as to mental capacity. They quote from *Commonwealth v. Wilson,*[13] 444 Pa. 117, 121, 281 A.2d 864, 865 (1971) for authority:

"The law is clear that a layman cannot render an opinion as to mental condition."

The quoted portion of our opinion in *Wilson,* supra, tends to support Knight's and Powell's position when considered out of context. The statement does not refer to the mere expression of any opinion about mental capacity; rather, it refers to the expression of an opinion by a layperson about mental capacity in relationship to the ultimate determination to be made by the jury. Considered in context, the statement stands for the proposition that a layman may not render an opinion as to a defendant's ability to know the nature and consequences of his acts because such an opinion is no more than an inference which the jury, composed of laypersons, is as equally capable of making. No necessity for such an ul-

12. The objections were limited to the competency of the witness to express such an opinion. The testimony was not challenged as being unresponsive.

13. We note the quoted portion of our opinion in *Wilson,* supra, constituted dicta and was expressly recognized as such in the opinion.

timate opinion by a layperson is present because the jury can perform this function with equal expertise. In contrast, an expert is allowed to express an ultimate opinion because his expertise exceeds that possessed by laypersons on the jury and is therefore both helpful and sometimes necessary to their consideration of the issues. See and compare the following and the numerous cases therein cited: Feldman, Pennsylvania Trial Guide, § 783; Jenkins, Pennsylvania Trial Evidence Handbook §§ 7.2–7.4; Levin, Summary of Pennsylvania Jurisprudence, Evidence, §§ 299–301, 344; 3 Wharton's Criminal Evidence, 13th ed., §§ 581–585, 609; P.L.E. Evidence, §§ 385, 386; McCormick, Evidence, §§ 11, 12, 14, 69, 71.

The distinction between the expression of an ultimate opinion which is proscribed by the language of *Commonwealth v. Wilson,* supra, and the instant facts is determinative. The distinction is that here the officer did not express an ultimate determination, that is, he did not state Knight or Powell knew the nature and consequences of their actions nor did he state they knew the difference between right and wrong. But he did state a general opinion as to mental capacity, and it remains to be determined to what extent a layman may do so and whether the officer's statement here is within the permissible bounds of expression of opinion by a non-expert.[14]

The law in Pennsylvania is clearly established: a lay-person or non-expert may express a general opinion

14. In *Commonwealth v. Updegrove,* 413 Pa. 599, 198 A.2d 534 (1964), also relied on by Knight and Powell, we held that a doctor who stated she could not say whether a defendant could distinguish between right and wrong was incompetent to express an opinion. Knight and Powell reason from this that *a fortiori* a layman may not express an opinion on mental capacity. Since the doctor could not express an expert opinion as to the ultimate issue she, like a non-expert, was incompetent to express any ultimate opinion. But such incompetency refers only to an expression of an ultimate opinion as to legal sanity and not to an opinion which is based on observable facts at the time of the relevant events and which does not attempt to advise the jury on the ultimate determination of the issue. See infra at n. 15.

as to mental capacity if he states the facts and observations upon which his opinion is based and if the facts and observations are reasonably related in time and circumstance to the time period for which mental capacity is an issue. *Commonwealth v. Moon,* 386 Pa. 205, 125 A.2d 594 (1956); *Commonwealth v. Gerade,* 145 Pa. 289, 22 A. 464 (1891); Rouch v. Zehring, 59 Pa. 74 (1868); *Owens Appeal,* 167 Pa.Super. 10, 74 A.2d 705 (1950). Cf. *Commonwealth v. Demmitt,* 456 Pa. 475, 321 A.2d 627 (1974); *Commonwealth v. Carluccetti,* 369 Pa. 190, 85 A.2d 391 (1952). The reason such an opinion is allowed is that, although the jury is capable of drawing its own conclusion as to mental capacity, see McCormick, Evidence §§ 11, 12 [Hereinafter: McCormick] the jury should be allowed to hear the general opinion of the non-expert because his general opinion merely represents a shorthand version of his total observations, all of which may not be easily expressed as separate and distinct factual observations; thus, the rule is one of convenience. But further, a witness may often find it impossible to relate all of his observations because of the many subtleties involved in observing a person's manner and demeanor which are not easily reducible to concrete expression but are as important as other observations; thus, the rule is also one of necessity. McCormick, § 11; Feldman, Pennsylvania Trial Guide, § 7.82. Thus, the rule which allows a non-expert to express a general opinion is wholly justified on the grounds of necessity and convenience.[15]

15. We do not think expressions of general opinions as to mental capacity by non-experts overly influence the jury's deliberations and ultimate determination. Jurors today are more sophisticated than ever before, and, as a result, there is now less danger than ever before of them accepting a witness's opinion as determinative. McCormick, §§ 11, 12. Thus, a non-expert may express a general opinion as to mental capacity where the facts and observations on which his opinion is based are stated. Of course, the facts and observations must be reasonably related in time and circumstances to the period of time during which mental capacity is in issue.

This case does not present the question of whether in light of the more sophisticated jurors now serving in our courts and in

■   As applied instantly, we do not believe error occurred when the court ruled the statement of the officer was admissible. First, the defense as developed through cross-examination clearly put the mental capacity of each defendant at issue. Second, the officer merely stated his general opinion as to mental capacity after having stated the observations he had made which lead him to conclude as he did.[16] Third, the officer did not state that the defendants knew right from wrong but that they knew what they were doing, and, as such, the opinion was a general expression and not an opinion as to the ultimate issue. Fourth, it would have been very difficult for the officer to express the demeanor, degree of coherence, and other such factors which formed the basis of his opinion in a sufficiently clear manner to enable the jury to have the full benefit of the officer's observations without the use of an opinion. Thus, the elements of convenience and necessity were present.

Based on all of these considerations and recognizing that the admission of such evidence is best left to the

light of the unshifting burden of proof borne by the Commonwealth following an assertion of a lack of mental capacity, see e. g., *Commonwealth v. Demmitt,* supra, a non-expert may also be allowed in future cases to express an ultimate opinion as to sanity and the like. See Act of January 2, 1975, P.L. 93–595, § 1, 88 Stat. 1937, 28 U.S.C.A. Rules of Evidence §§ 701, 704; McCormick, §§ 11–17. But see *Commonwealth v. Wilson,* supra; *Commonwealth v. Updegrove,* supra.

16.   We note the opinion as to mental capacity as it related to an effective waiver of constitutional rights was based on observations made at the time of the waiver; while, the officer's opinion as to mental capacity as it related to sanity and mental capacity to form specific intent to kill was based on observations made a few hours after the commissions of the crimes. But the time lapse between the officer's observations and the period about which he stated his opinion was only a few hours. Moreover, the defendants were recounting the circumstances of the killings when the officer made his observations and the jury was made aware by the testimony that the observations were made subsequent to the killings. Thus, a reasonable connection in terms of both time and circumstances between the observations and the time period about which the opinion was expressed exists to justify the admissibility of such an opinion.

sound discretion of the trial court, see e. g., *United States v. Mesarosh*, 223 F.2d 449 (3rd Cir. 1955) reversed on other grounds 352 U.S. 1, we conclude no abuse of discretion resulted from ruling the opinion of the witness was admissible.

## IV.

The final argument, advanced only by Powell, also relates to the expression of a general opinion as to mental capacity by a non-expert. Powell sought to introduce the testimony of his brother, a non-expert, with regard to Powell's mental capacity at the time the crimes were committed. Powell asserts that if the police witness's testimony, as discussed before, was proper evidence, then his brother's testimony was likewise proper. But a careful review of the offer of proof indicates that this assertion has no foundation in the record and that the trial court did not err in excluding the brother's testimony.

Counsel stated Powell's brother would "indicate in some instances isolated and in other instances continued unusual behavior coupled with repeated severe headaches" which incapacitated Powell. But when asked by the court following objection whether there would be any showing that the headaches were present at the time of the crimes or statements, counsel responded negatively. Further, when asked by the court if there would be any showing of bizarre behavior immediately prior to the statements or crimes, counsel again responded negatively. Finally, when asked by the district attorney what time frame was involved, counsel responded "at least six (6) months before the commission of the crimes." The court then ruled the testimony inadmissible.

The distinction between Powell's offer and the officer's testimony is that the opinion of Powell's brother and the observations on which it was based were so disconnected in time from the statements and crimes that

the offered testimony was irrelevant to mental capacity at the times in issue. Moreover, counsel did not offer to connect the testimony to the relevant times by showing the physical manifestations which served as the basis for Powell's brother's opinion existed at the relevant times. Under such circumstances, we are not prepared to say the court abused its discretion in refusing to admit the testimony because it was irrelevant to mental capacity at the time of the crimes and statements. See generally, *Commonwealth v. Cavalier*, 284 Pa. 311, 131 A. 229 (1925); *Commonwealth v. Carluccetti*, supra; *Commonwealth v. Moon*, supra; *Commonwealth v. Zlatovich*, 440 Pa. 388, 269 A.2d 469 (1970); *Commonwealth v. Buccieri*, 153 Pa. 535, 26 A. 228 (1893); *Commonwealth v. Wirebach*, 190 Pa. 138, 42 A. 542 (1899); *Commonwealth v. Marion*, 232 Pa. 413, 81 A. 423 (1911.); P.L.E. Evidence § 385.

Following this ruling counsel asked to be allowed to object formally for the record. He then stated that besides testifying to headaches and emotional condition Powell's brother would have testified to a "similar incident either the day of the killings or the day before involving a family argument with the Powells, during which Bruce Powell . . . became unusually upset." The court again refused to admit the testimony because it did "not relate in point of time to a period of time immediately prior to the giving of the alleged voluntary statement or the killings . . . ." While the time relationship involved in this offer was much closer to the relevant times, and while we do not now approve a requirement of immediacy, counsel did not offer to show Powell's mental capacity was reduced when he became upset.[17] Nor did

17. While the distinction between the officer's testimony and Powell's offer may at first glance appear to be a very fine one in terms of time, our determination is also influenced by the substance of counsel's offer. The substance of the second offer by counsel reflects only that Powell became "upset"; no offer was made to show any reduction in mental capacity resulted from Powell becoming upset.

counsel offer to show that headaches were present at the time Powell became upset, and yet, counsel had previously stated such headaches accompanied instances in which Powell was "incapacitated." Finally, counsel did not offer to show Powell's becoming upset "either the day of the killings or the day before" was *reasonably related in time and circumstances* to the time of the statements and killings. Thus, again we can find no abuse of discretion in refusing to admit the testimony under these circumstances.

Since we have determined the evidence was sufficient to support the verdicts and that no basis warranting a new trial has been advanced, the judgments of sentence are affirmed.

ROBERTS and NIX, JJ., concur in the result.

MANDERINO, J., filed a dissenting opinion.

MANDERINO, Justice (dissenting).

I dissent. Both Knight and Powell are entitled to a new trial because of the prejudice created by allowing the interrogating police officer to state that in his opinion both defendants " . . . knew what they did . . . knew when they did it . . . [and] knew what they were doing . . ." The majority opinion concludes that this witness, a witness not qualified as a psychiatric expert, should nevertheless be allowed to express an opinion as to a defendant's mental capacity because the expression of such an opinion was justified on grounds of "necessity and convenience." While I have grave doubts as to the validity of such a rule, even if we were to accept it as the law of this Commonwealth, the result reached by the majority would remain in error. As acknowledged by the majority opinion, the mental capacity of each defendant was clearly at issue in this case. Before it could reach a verdict, the jury had to decide at least two questions concerning the defendant's respective

mental capacities: first the jury had to decide whether or not the defendants possessed the requisite degree of sanity to be guilty of criminal homicide at all; if the jury concluded that the defendants were sane, and therefore capable of committing a criminal homicide, it still had to decide whether or not the defendants possessed sufficient mental capacity to form the intent to commit murder in the first degree. While it is true, as stated by the majority opinion, that the testifying police officer did not say specifically that, in his opinion, appellants "knew the nature and consequences" of their actions nor did he state they knew the "difference between right and wrong," his expression of opinion as to their mental capacities came sufficiently close to intruding upon the jury's exclusive function of making these determinations that it should not have been allowed into evidence.

The majority concludes that the "rule of convenience and necessity" was satisfied in this case because the testifying officer merely used a "shorthand version" of expressing his total observations, "all of which may not [have been] easily expressed as separate and distinct factual observations . . . ." The majority continues, however, to state that prior to the making of the statement in question, the testifying police officer "stated the observations he had made which led him to conclude as he did." Having thus stated what he observed while questioning the defendants, the issue of whether or not the defendants had requisite mental capacity was adequately presented to the jury for its decision, and no "rule of convenience" was served by allowing the officer to state his conclusion as to their mental capacities. For this reason alone the officer's conclusion should not have been allowed into evidence.

Additionally, however, the officer's opinion was not "necessary" in the instant appeal. The majority states that "it would have been very difficult for the officer to express the demeanor, degree of coherence, and other

such factors which form the basis of his opinion in a sufficiently clear manner to enable the jury to have the full benefit of the officer's observations without the use of an opinion." This statement is at odds with the purpose of the criminal process. It is the duty of the prosecution, through its witnesses and evidence, to establish *facts* upon which a jury may make its determination. The prosecution should not be allowed to use opinion evidence simply because the subject is difficult to prove. Police officers are experienced in testifying in court and often are called upon to give factual descriptions of a person's demeanor; of a person's coherence or lack of coherence; of a person's difficulty or lack of difficulty in walking or standing, or in performing various other functions. There was therefore no need for the officer here to state his opinion as to the mental capacity of the defendants.

Because I would reverse the judgment of sentence and remand for a new trial on this issue alone, I do not now discuss the other allegations of error raised in this appeal.