J-A19028-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MALIK SMITH | : | |
| | : | |
| Appellant | : | No. 1313 EDA 2020 |

Appeal from the Judgment of Sentence Entered February 7, 2020
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0003461-2018

BEFORE: DUBOW, J., MURRAY, J., and COLINS, J.[*]

MEMORANDUM BY MURRAY, J.:                     Filed: September 2, 2021

Malik Smith (Appellant) appeals from the judgment of sentence imposed after the trial court found him guilty of attempted murder, aggravated assault, possession of a firearm prohibited, conspiracy to commit murder, firearms not to be carried without a license, carrying firearms on public streets in Philadelphia, possessing an instrument of crime, simple assault, and recklessly endangering another person.[1] We affirm.

The trial court detailed the underlying facts as follows:

> Appellant's convictions stem from his alleged shooting of R.D., an adult male complainant. At trial, R.D. repeatedly denied having any recollection of the underlying incident. Accordingly, the Commonwealth introduced [R.D.]'s prior written statement to

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 901(a), 2502, 2702(a)(1), 6105(a)(1), 903, 2502, 6106(a)(1), 6108, 907(a), 2701(a)(1), and 2705.

police (taken one day after the shooting), in which he identified Appellant as the individual who shot him[.]

On January 18, 2018, R.D., Hector Carcana ("Carcana"), and a third man identified as "Pito" were gathered outside of Pito's residence near Frankford Avenue and Pickwick Street in Philadelphia. Around 12:00 p.m., R.D. noticed Appellant "selling weed and hard" in front of Pito's home. R.D. confronted Appellant and asked him "not to do that there, to do it somewhere else." Appellant retorted, "I can sell wherever I want," and the two men argued and "shouted" for several minutes. Eventually, the argument "fizzled" and Appellant left.

Around 5:20 p.m., R.D. was standing alone in front of the same residence when two men "wearing all black" approached him and fired multiple bullets into his chest and legs. R.D. heard the gunshots and recognized Appellant as one of the assailants, but he did not immediately realize that he had been shot. In his statement to police, R.D. explained, "all of a sudden I heard gunshots. I didn't recognize if it was me at first getting shot. I looked and thought, shit. It's me getting hit. And again, I saw the guy who I argued with shooting at me. He was wearing different clothes but it was him." Despite sustaining eight gunshot wounds, R.D. managed to stand, walk up four steps, and enter Pito's home before collapsing on the floor inside.

Carcana and Pito's mother, Janice Ortiz ("Ortiz"), heard the gunshots from inside the home and quickly realized that R.D. had been shot. Carcana called 911, as Ortiz applied pressure to R.D.'s wounds. Carcana explained that R.D. was "frantic" and urged his friends "not to let him die." As he lay bleeding and begging for his life, R.D. told Carcana that Appellant—the person "he got into the argument with before the whole incident"—was the individual who shot him. Police officers arrived and immediately transported R.D. to Temple University Hospital, where he was treated for several severe injuries.

The following day, January 19, 2018, Detective James Miles ("Detective Miles") and his partner interviewed R.D. at the hospital. During the interview, R.D. unequivocally stated that the man who quarreled with him was the same man who returned hours later and shot him. R.D. described his attacker as a "black male with dreads. About 5'4, 5'5. About the same age as me." He further explained that during the argument, his assailant wore

- 2 -

"a hoodie, gray jacket with big buttons going down the middle of it, and purple sneakers," but when the assailant returned, he wore an all-black outfit.

That same day, Officer Brendan McCauley ("Officer McCauley") administered a photo array from which R.D. specifically identified Appellant as the individual who shot him[.]

Although Carcana did not witness the attack, he also identified Appellant from a photo array. He specifically told police that Appellant was "the person he saw R.D. in a fight with before the shooting." Carcana further informed police officers that he believed the identified person's name was "Malik."

Ortiz testified that she did not see the argument or the shooting. However, members of Ortiz's household informed her that R.D. and [Appellant] had argued on the day at issue, and she conveyed this information to the police. She further stated that she knew [Appellant] as her neighbor[.] …

Based on this information, Detective Miles was able to determine that a "Malik Smith, also known as Malik Spivey [], who's the defendant here . . . used to reside at 3654 Frankford Ave. And he was a shorter male and had dreadlocks." Detective Miles then created a photo array discussed *supra*, which included a photograph of Appellant. After R.D. and Carcana positively identified Appellant from the array, Detective Miles received and executed a warrant to search Appellant's residence. Officers recovered, *inter alia*, "a long blue jacket with buttons down the center, a black North Face jacket, purple sneakers, and a Red Bull cap." Appellant was arrested on February 7, 2018 and charged with attempted murder and related charges.

At trial, the Commonwealth introduced four surveillance videos from the area of Frankford Avenue and Pickwick Street. The submitted videos were recorded after the alleged quarrel and consequently do not show it. However, Appellant was recorded walking in the area a few hours after the argument (around 3:00 p.m.), wearing purple sneakers and a long dark coat with buttons down the center. Further, Carcana identified Appellant in open court as (1) the individual in the video wearing purple sneakers and a long grey-blue coat with buttons, and (2) the individual who argued with R.D. hours before the shooting.

Trial Court Opinion, 12/17/20, at 3-7 (record citations and footnotes omitted).

The trial court rendered its guilty verdicts following trial on July 22, 2019. On February 7, 2020, the court sentenced Appellant to an aggregate 11½ to 23 years of incarceration. Appellant filed a timely post-sentence motion which was denied by operation of law on June 22, 2020. Appellant timely appealed. Both Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant presents two issues for our review:

1. Whether the trial court violated Appellant's right to a public trial by barring Appellant's mother and sister from the courtroom while the complainant and a second witness testified without conducting a hearing to determine whether the mother or sister had been involved in any kind of witness intimidation?

2. Whether the trial court erred in finding that the weight of the evidence supported a conviction where the video of the incident conclusively provided that the complainant, who was the only identification witness, could not see who shot him because he was shot in the back by men who were wearing facial coverings and who ran away before he could have seen them?

Appellant's Brief at 7.

In his first issue, Appellant argues the trial court violated his right to a public trial as guaranteed by Article I, Section 9 of the Pennsylvania Constitution, and the Sixth and Fourteenth Amendments of the United States Constitution. *See* Appellant's Brief at 18-27. He states the court "did so by refusing to allow Appellant's mother and sister to remain in the courtroom during the testimony of the Commonwealth's main witnesses, [R.D.] and his friend." *Id.* at 18.

- 4 -

"[T]he determination of whether to exclude spectators, as well as the determination of the scope and duration of an exclusion order, must be left to the sound discretion of the trial court because it alone is sufficiently close to the circumstances to apprehend fully the subtleties that may be present." **Commonwealth v. Conde**, 822 A.2d 45, 49 (Pa. Super. 2003) (footnote omitted). "Thus, only if a trial court abused its discretion in issuing an exclusion order or in fashioning the order will reversible error be found on appeal." **Id.**

Although the right to a public trial is provided in both the Pennsylvania and United States Constitutions, it is not absolute. **Commonwealth v. Knight**, 364 A.2d 902, 906 (Pa. 1976). A court may issue an exclusion order if it determines such action is necessary under the circumstances. However, the exclusion order "must be fashioned to effectuate protection of the important interest without unduly infringing on the accused's right to a public trial either through its scope or duration." **Id.**

In furtherance of his argument, Appellant relies on this Court's decision in **Commonwealth v. Penn**, 562 A.2d 833 (Pa. Super. 1989). **See** Appellant's Brief at 20-23. In **Penn**, we reversed a trial court's decision to entirely close its courtroom during testimony of a witness because of alleged intimidation. We held that in closing the courtroom, "such encroachment on a defendant's rights requires, at a minimum, that the trial court first determine whether or not the threat of injury or intimidation in fact exists." **Id.** at 839 (citation and emphasis omitted). Citing **Penn**, Appellant contends the trial

court failed to determine whether the threat of injury or intimidation existed before it issued its exclusion order. *See* Appellant's Brief at 20-23. The record belies Appellant's argument.

Prior to the start of trial, the Commonwealth informed the court there were "issues regarding potential witness intimidation," and R.D. was "very concerned about testifying." N.T., 7/22/19, at 4-5. Accordingly, the Commonwealth requested R.D. and Mr. Carcana be allowed to testify without Appellant's family members in the courtroom. *Id.* at 4, 10. Defense counsel objected, and asked specifically that "my client's mother be allowed to remain in the room." *Id.* Noting that Appellant was indicted by a grand jury, the trial court granted the Commonwealth's request. *Id.* at 5; *see also* Pa.R.Crim.P. 556.2(A) (to grant Commonwealth's request for an indicting grand jury, a judge must determine "probable cause of witness intimidation exists."). The court permitted Appellant's family to re-enter the courtroom after R.D. and Mr. Carcana testified. *Id.* at 53. It explained:

> [T]he Commonwealth moved to have Appellant's family and/or associates cleared from the courtroom for the duration of R.D.'s and Carcana's testimony. … [T]his court granted the Commonwealth's request (over defense counsel's objections), issued an order temporarily excluding Appellant's associates from the courtroom, but did not otherwise close the room to the public. …
>
> Although this court did not interview R.D. in regards to the nature and extent of the alleged intimidation, critical facts support this court's exclusion order[.] … First, this court's order was limited in both its scope and duration, and applied only to R.D.'s and Carcana's testimony (the two witnesses who directly identified Appellant to police.) Notably, the temporarily excluded persons

were permitted to observe every other part of Appellant's trial, and the general public was not excluded from any portion of the trial. …

Here, Appellant's case was initially presented to an indicting grand jury, a fact on which this court expressly relied. To initiate criminal proceedings against a defendant by way of an indicting grand jury—rather than a preliminary hearing—the Commonwealth must "allege facts asserting that witness intimidation has occurred, is occurring, or is likely to occur." Pa.R.Crim.P. 556.2(A)(1). …

In the case at bar, the judge who presided over Appellant's grand jury hearing evidently found that the Commonwealth sufficiently alleged "witness intimidation occurred, was occurring, or was likely to occur," pursuant to Rule 556.2. The president judge approved these findings, as demonstrated by the fact that the Commonwealth was permitted to proceed with a grand jury, rather than a preliminary hearing. The fact that Appellant's case proceeded with a grand jury in and of itself indicates that witness intimidation has been a component of this case since its inception. This court was persuaded accordingly[.]

It is also worth noting that R.D.'s demeanor and testimony subsequently validated the prosecutor's representations of potential witness intimidation[.] … Throughout his trial testimony, R.D.'s discomfort was palpable and very apparent to this court. [R.D.] resisted questioning and—unconvincingly—claimed that he suddenly could not remember any details of the underlying incident, stating multiple times that he was not "too sure" about the most basic facts. For example, in his statement to police, R.D. recalled the underlying events in great detail, noting that when he and Appellant were arguing, Appellant was wearing "purple sneakers" and a coat with distinctive buttons. Yet at trial, R.D. suddenly could not recall seeing Appellant or arguing with anyone on the day at issue. R.D. even claimed not to remember Carcana's last name—despite the fact that the two men have been friends since elementary school. …

Thus, the Commonwealth's representations of witness intimidation coupled with this court's observations of [R.D.] and his obviously cowed demeanor, further support this court's exclusion order.

Trial Court Opinion, 12/17/20, at 17-20 (citations to notes of testimony omitted).

We discern no error. As noted, this case was initially presented to a grand jury, which requires a judge find probable cause of witness intimidation. *See* Grand Jury Indictment, 5/3/18. Also, while the trial court temporarily barred Appellant's family from the courtroom, the general public was not excluded, and the court's decision was reinforced by R.D.'s demeanor at trial. *See Knight*, 364 A.2d at 907 (witness's difficulty testifying validated Commonwealth's representations and supported trial court's exclusion order). Thus, no relief is due.

In his second issue, Appellant claims his convictions are against the weight of the evidence.[2] We have explained:

> When considering challenges to the weight of the evidence, we apply the following precepts. "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Talbert*, 129 A.3d 536, 545 (Pa. Super. 2015), *appeal denied*, 635 Pa. 773, 138 A.3d 4 (2016) (quotation marks and citation omitted). Resolving contradictory testimony and questions of credibility are matters for the finder of fact. *Commonwealth v. Hopkins*, 747 A.2d 910, 917 (Pa. Super. 2000). It is well-settled that we cannot substitute our judgment for that of the trier of fact. *Talbert*, *supra*, at 546.
>
> Moreover, "Appellate review of a weight claim is a review of the exercise of discretion, not the underlying question of whether the verdict is against the weight of the evidence." *Id.* at 545–46.

_____

[2] Appellant preserved this issue as required by Pa.R.Crim.P. 607 by raising it with the trial court in a post-sentence motion. *See* Post-Sentence Motion, 2/12/20, at 4-5.

"Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is [or is not] against the weight of the evidence." *Id.* at 546. "One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice." *Id.*

Furthermore, "in order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Id.* (quotation marks and citation omitted).

*Commonwealth v. Miller*, 172 A.3d 632, 642-43 (Pa. Super. 2017).

Significantly, Appellant concedes the "testimony of [R.D.], if believed, was sufficient for a conviction." Appellant's Brief at 28. He nonetheless argues:

[t]he verdict was against the weight of the evidence because the surveillance video clearly showed that [R.D.], who was the only identification witness, could not have seen who shot him. Additionally, he and his friend lied repeatedly, denied having made prior statements, denied that they were selling drugs, and provided no other reliable evidence from which to conclude Appellant committed this crime. Accordingly, while the evidence may have theoretically been sufficient in that [R.D.] claimed that he saw the shooter, the trial court abused its discretion in denying the post-sentence motion because the video clearly showed that the testimony was false.

*Id.* at 27.

Here, the trial court sat as the factfinder. It opined:

As Appellant correctly notes, R.D. denied knowing the identity of his assailant during his testimony at trial. *This court did not find his alleged memory lapse to be credible*, however. . . . [T]his court determined that R.D.'s failure to provide an in-court identification was due to his fearful refusal—not his inability—to

- 9 -

truthfully accuse his assailant in court.

Moreover, Appellant's argument—that the victim could not have seen who shot him because he was facing the wrong direction and using his cell phone—is not persuasive. The video presented at trial (Ex. C-4B) depicts the following facts: (1) Moments before the attack, the victim was standing with his back against the residence, as he looked down at his phone; (2) the assailants approached the victim from the left side of his body; (3) immediately after the first shot, the victim hunched his upper body, before turning his gaze directly towards the shooters; and (4) the victim then turned towards his right shoulder (facing away from the attackers) and fell to the ground on his back, before rolling over and **again looking directly at the shooters**. The interaction lasted less than one minute, but R.D. had adequate opportunity to see his assassin's face.

Appellant accurately notes that the attackers wore masks or hoods which partially obscured their faces, but this paltry fact does very little to undermine this court's verdict. The first assailant wore a mask that only concealed the area below the tip of his nose. The surveillance video shows that the bridge of the assailant's nose, his eyes and his forehead were clearly exposed—revealing adequate bone structure to make him recognizable. The second assailant did not wear any sort of face covering. Thus, R.D. had sufficient opportunity to both see and identify his attackers—a fact that this court considered in rendering its verdict.

In all, this court considered and weighed (1) the video evidence as a whole; (2) the fact that one of the assailants wore a mask that partially obscured his face; (3) R.D.'s out-of-court identifications; (4) R.D.'s failure to identify Appellant in court; (5) the testimony of Carcana, Detective Miles, and Officer McCauley; (6) the fact that Pito and Ortiz knew Appellant as their neighbor and informed police that the person who argued with R.D. was named "Malik"; (7) Carcana's in-court identification of Appellant as the person who argued with R.D. and the person in the video wearing purple sneakers and a long dark coat with buttons; (8) the evidence recovered from Appellant's home, which included purple sneakers and a long blue coat with buttons; and (9) R.D.'s physical description of the shooter, a description that plainly fits Appellant and the assailant seen in the surveillance video. Thus, the weight of the evidence easily supports the verdict, and

Appellant is entitled to no relief on this claim.

Trial Court Opinion, 12/17/20, at 13-14 (citations to notes of testimony and footnote omitted, italic emphasis added, bold emphasis in original).

Again, our review of the record supports the trial court's reasoning. It is well-settled that we may not reweigh the evidence, and to the extent the evidence was contradictory, "contradictions in the testimony of any witnesses are for the fact finder to resolve." ***Commonwealth v. Sanders***, 42 A.3d 325, 331 (Pa. Super. 2012). Accordingly, no relief is due.

Judgment of sentence affirmed.


Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/2/21