453 A.2d 578

COMMONWEALTH of Pennsylvania, Appellee,

v.

Samuel C. CONTAKOS, Appellant.

Supreme Court of Pennsylvania.

Argued Sept. 22, 1982.

Filed Dec. 1, 1982.

Reargument Denied Jan. 17, 1983.

341

Dennis J. Clark, Pittsburgh, for appellant.

Gerald R. Solomon, Dist. Atty., Ralph C. Warman, First Asst. Dist. Atty., Uniontown, for appellee.

Before O'BRIEN, C.J., and ROBERTS, NIX, LARSEN, FLAHERTY, McDERMOTT and HUTCHINSON, JJ.

OPINION

FLAHERTY, Justice.

On March 13, 1979 Samuel C. Contakos was convicted in the Court of Common Pleas of the Fourteenth Judicial District, by a jury, of first degree murder and criminal conspiracy. The next day, after hearing evidence as to aggravating and mitigating circumstances, the jury returned a verdict of life imprisonment as the sentence for the murder conviction. Contakos also received a consecutive sentence of five to ten years on the conspiracy conviction. An appeal was taken to this Court, and on February 4, 1981, we vacated the judgment of sentence and remanded the case for a determination as to whether the nondisclosure of certain written records of interviews with Commonwealth witnesses who testified at trial was harmless error. On March 25, 1982 the trial court issued an order reinstating the judgment of sentence and ruling that the error was harmless. Following the trial court's reinstatement of judgment of sentence, the instant appeal was taken to this Court, which appeal was specifically allowed by our February 4, 1981 order.

■ Appellant raises eight assignments of error, but because we agree that reversible error was committed when the trial court cleared the courtroom during part of the trial, we do not address the other matters complained of.[1]

1. The other claims raised are (1) the lower court erred in ruling that the Commonwealth's failure to produce certain written records concerning witness interviews was harmless error; (2) it was error to deny certain points for charge and instructions to the jury; (3) the sentence is illegal and the applicable sentencing provision is unconstitutional; (4) it was error to deny the pretrial motion for change of venue; (5) the lower court erred in evidentiary rulings on rebuttal testimony and dates of a fingerprint analysis; (6) the lower court erred in failing to dismiss the informations because of violation of constitutional and speedy trial rights. We decline to discuss these issues because of our decision to award a new trial on the public trial-open court issue. Other claims, viz., that the lower court erred in refusing to admit appellant's evidence concerning statements made by the deceased victim to certain family members; that the lower court erred in denying evidence of routine and habit as part of an alibi defense; and that the court erred in failing to instruct on the

The factual setting of appellant's claim that reversible error was committed when the trial court closed the trial to the public is as follows. Immediately before the Commonwealth's chief witness was to testify, the trial judge was notified by the Pennsylvania State Police that an attempt might be made on the life of the next witness. Over defense objection, the trial judge closed the courtroom during the testimony of this one witness, except that members of the media were allowed to be present. It is unclear from the record whether all media personnel were permitted to be in the courtroom, or whether only certain media personnel were admitted. In any event, the trial was closed to the public, including members of appellant's family, during the testimony of the Commonwealth's main witness. The question raised on this appeal is whether a segment of a criminal trial may be closed to the public in order to protect the life of a witness, upon reliable information that an attempt might be made on that person's life.

Appellant asserts the abridgment of his right to a public trial under the First, Sixth and Fourteenth Amendments to the United States Constitution, and under Art. I Sect. 9 of the Pennsylvania Constitution. Because we hold that the closure in this case was violative of the Pennsylvania Constitution, we do not address the federal claim.

The Pennsylvania Constitution at Article I, section 9, provides: "In all criminal prosecutions the accused hath a right to . . . a speedy public trial by an impartial jury of the vicinage," and Article I, section 11 provides: "All courts shall be open." Section 11, mandating open courts, has been the law of Pennsylvania for three hundred years. It was present in the Pennsylvania Frame of Government of 1682 and was reaffirmed in § 26 of the Constitution adopted by Pennsylvania in 1776. See *Richmond Newspapers v. Virginia,* 448 U.S. 555, 568, 100 S.Ct. 2814, 2822, 65 L.Ed.2d 973, 984 (1980), citing *Sources of Our Liberties,* ed. R. Perry, 217 (1959), 1 B. Schwartz, *The Bill of Rights: A Documentary*

intoxication defense, are likely to arise again in a new trial and will require close scrutiny by the trial court on remand.

*History,* 140 (1971). Section 9, providing for a "speedy public trial," was adopted in the Pennsylvania Declaration of Rights in 1776. Schwartz, *Id.,* 265.

The historical basis for public trials and the interests which are protected by provisions such as Pennsylvania's open trial mandate have been well researched and discussed in two recent opinions of the United States Supreme Court, *Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979), and *Richmond Newspapers, Inc. v. Virginia, supra,* and can be briefly summarized as follows: generally, to assure the public that justice is done evenhandedly and fairly; to discourage perjury and the misconduct of participants; to prevent decisions based on secret bias or partiality; to prevent individuals from feeling that the law should be taken into the hands of private citizens; to satisfy the natural desire to see justice done; to provide for community catharsis; to promote public confidence in government and assurance that the system of judicial remedy does in fact work; to promote the stability of government by allowing access to its workings, thus assuring citizens that government and the courts are worthy of their continued loyalty and support; to promote an understanding of our system of government and courts.

These considerations, which were applied by the United States Supreme Court in its analysis of the First and Sixth Amendments in *Gannett* and *Richmond Newspapers* apply equally to our analysis of Pennsylvania's constitutional mandate that courts shall be open and that an accused shall have the right to a public trial. We are mindful, as was the Court in *Richmond Newspapers,* of our virtually unbroken history of public trials and openness in criminal trials. Justice Hugo Black has well expressed the pervasiveness of this tradition:

[W]e have been unable to find a single instance of a criminal trial conducted in camera in any federal, state, or municipal court during the history of this country. Nor have we found any record of even one such secret criminal trial in England since abolition of the Court of Star

Chamber in 1641, and whether that court ever convicted people secretly is in dispute....

This nation's accepted practice of guaranteeing a public trial to an accused has its roots in our English common law heritage. The exact date of its origin is obscure, but it likely evolved long before the settlement of our land as an accompaniment of the ancient institution of jury trial. *In re Oliver,* 333 U.S. 257, 266, 68 S.Ct. 499, 504, 92 L.Ed. 682 (1948), cited in *Richmond Newspapers, supra,* 448 U.S. at 573, n. 9, 100 S.Ct. at 2825, n. 9, 65 L.Ed.2d at 987, n. 9.

■ Pennsylvania, however, has a concern with public trials that goes beyond even the unbroken history of public trials to which Justice Black refers. In Pennsylvania it is *specifically* and constitutionally mandated that courts shall be open. In other words, the public shall not be excluded from trials, the courts shall not be closed. That members of the media were present during the closure in this case does not satisfy the requirement of openness. While it is true that attendance at a criminal trial is subject to reasonable time, place and manner restrictions, *Cf. Richmond Newspapers, supra,* at 581, n. 18, 100 S.Ct. at 2829, n. 18, 65 L.Ed.2d at 992, n. 18, the openness mandated by our constitution is not satisfied if only representatives of the media are present in the courtroom. Exclusion of the public would strike at the essence and meaning of our mandate for an open court, for the public counterbalances what might otherwise become a tyranny of the media, and the public and the media together counterbalance the possible emergence of a corrupt or biased judiciary.

In order to understand the especially important place that openness of trials has in Pennsylvania, it is well to remember that William Penn was himself the victim of a trial conducted without regard for due process. In 1670 William Penn and William Mead were tried before a jury at the Old Bailey in London on an indictment of unlawful assembly, disturbing the peace, and "causing a great concourse and tumult." Penn, *The Tryal of William Penn and William Mead for Causing a Tumult* (1719, 1919 Boston) 2. Penn had

addressed a group of three hundred Quakers in Grace Church Street, London, after the Quakers had found their meeting house locked by order of the crown. At the trial which followed, the jury found that Penn spoke in the street, but refused to find him guilty of any criminal offense. The judges directed the jury to find the defendants guilty as charged, but the jury refused, whereupon the court directed that they be confined without food or amenities until they complied.

The jury, however, refused to comply, and the trial was abruptly ended after the jury had been confined to the jury chamber for two days. The court's displeasure with the verdict was reflected in its fining of the jurors forty Marks each and imprisoning them until the fines were paid. Although Penn was found not guilty, he too was imprisoned for fines based on contempt of court. The jurors were released, however, after Chief Justice Sir John Vaughan of the Court of Common Pleas issued a writ of habeas corpus. The Chief Justice held that judges may not compel a verdict in a criminal case against the convictions of the jury. *See* "The Trial of William Penn," 6 *Litigation* (Winter 1980), 35, 49.

This trial is likely to have left an impression on Penn. He considered the charges against him to be in violation of the Great Charter of 1225 and the earlier version, the Magna Carta; he was repeatedly removed from the courtroom by force and held in the "bayl dock," a cage-like structure; and the tone of the trial was one of bullying and even open threat.[2]

2. At one point in the trial, the following exchange occurred between the foreman of the jury, the juror Bushel, and the Lord Mayor Samuel Starling, who was the presiding judicial officer:

CLERK. What say you? Look upon the Prisoners at the Bar. Is William Penn Guilty of the Matter whereof he stands indicted, in Manner and Form as aforesaid, or Not guilty?

FOREMAN. William Penn is guilty of Speaking in Grace Church-Street.

MAYOR. To an unlawful Assembly?

BUSHEL. No, my Lord, we give no other Verdict than what we gave last Night; we have no other Verdict to give.

MAYOR.   You are a factious Fellow, I'll take a Course with you.

SECOND JUDGE.   I knew Mr. Bushel would not yield.

BUSHEL.   Sir Thomas, I have done according to my Conscience.

MAYOR.   That Conscience of yours would cut my Throat.

BUSHEL.   No, my Lord, it never shall.

MAYOR.   But I will cut yours so soon as I can.

*The Tryal of William Penn, supra,* 26–27.

Penn's response to these events, in part, is recorded in his "Exceptions Against the Procedure of the Court":

[Six exceptions preceded the following:]

7th   I cannot but except agt yr Illegal Proceedings in not suffering me to plead for myself, or to be fully heard either by way of Question, or Answer: nor yet to make, nor offer those material, & necessary Demands, & Objections; which is my undoubted Right. As (1st) That you of the Bench should be my Council; & not with harsh menaces, & scornful Repartees to prevent or silence my legal & sober Offers.   Nor yet (2d) When I asked Oyr of the Law (you pretend I have broken) that you should deny it me, as a motion agt the honour of the Court; though the known Common rights of every Englishman.   Neither (3d) should you hale me by violence from the Barr into the Bayl dock & then to give the Jury Charge in my Absence: which is notoriously agt the Law.   Nor, when I called upon you to signifie as much; immediately to send me into the stinking Hole, & then to say your pleasure of me to the Jury.   And when they agreed not upon their Verdict; to minace & abuse them with severe Reflections.   Nay, when the Verdict was agreed upon; you utterly refused it, and swore certain persons, to keep them locked up all night, in order to obtain your ends; although I asked a Record of the Verdict, & that the Sentence of the Bench ought to wait upon, & be pursuant to the Verdict of the Jury.

These Exceptions above written I make, as good in Law, if you deny me the Benefit of them, as being agt Law: & my Right, as an Englishman, I require you to give it me under your Hands & Seals. as you in the Like case ought to do.

*The Papers of William Penn,* ed. Dunn & Dunn (1981), 175–76.

Adding to Penn's troubles, the trial occurred when his father was near death.   Penn wrote to his father describing the trial as follows:

Dear Father:

Because I cannot come, I write.   These are to lett thee know that this morning about 7 we were remanded to the Sessions.   The Jury after two nights & two days being locked up, came down & offerr'd their former verdict, but that being refused as not so positive, they explained themselves in answering not Guilty.   Upon which the Bench were amazed, & the whole Court so satisfyed that they made a Kinde of Hymne—but th[at] the Mayor Recorder Robinson & might add to their Malice, they fined us to the number of about 12 of us, for not pulling off our hatts & [kept] us prisoners for the mony An injurious trifle [which] will blow over, or we shall bring it to the Common Pleas because it was against Law & not by a Jury sessed.   How Great a dissatisfaction three of their actions have begott may very reasonably be conjectured from the bare Mention of them (1) That the Jury was about 6 times rejected in their verdict & besides vaine fruitless illegal menaces, were kept two

It seems not unduly speculative that Penn had this trial in mind when, in 1682, he wrote by his own hand in his Frame Of Government that all courts shall be *open.* The Frame of Government was a contract between the proprietor, Penn, and the citizens of his colony, expressing his political philosophy and proposed laws for the governance of the colony. Illick, *Colonial Pennsylvania: A History* 14 (1976). The language employed by Penn has remained unchanged in the respective constitutions of our Commonwealth. It is, of course, unthinkable to us that a contemporary defendant in a criminal case could be treated as was Penn. But our assurance of fairness derives, at least in part, from our knowledge that our courts are open. Closed trials are the mechanics of tyranny.

The public and representatives of the press alike enjoy the constitutional right in Pennsylvania to attend trials. Neither may be excluded because the other is present. *Cf. Estes v. Texas,* 381 U.S. 532, 540, 85 S.Ct. 1628, 1631, 14 L.Ed.2d 543, 549 (1965), (representatives of the media have the same right as the public to attend criminal trials). This right of the public to attend criminal trials and of the accused to be assured of the freedom of the public to attend these trials and to monitor what goes on there has been abridged in this case. The trial court failed to preserve the appellant's constitutional right to an impartial public trial. Accordingly, we reverse the judgment of sentence and remand for a new trial.

days & two nights without bed, tobacco provisions & (2) that a Sessions should be held on the first day [Sunday] (the designe we know) (3) that the Jury, [the] only judges by law should be fined 40 Marks each. & to be prisoners till they have paid it and that without any Jury to pass upon [t]hem. However their verdict is accepted for us. because they did not dare deny it. This is the Substance. The Circumstances I shall personally relate if the Lord will. I am more concerned at thy distemper & the pains that attend it than at my own [mere] Imprisonment which workes for the best.

> I am Dear Father.
> Thy obt Sonne.
> Wm Penn.

*Id.,* 177, Letter of September 5, 1670.

ROBERTS, J., files a concurring opinion in which O'BRIEN, C.J., joins.

NIX, J., files a dissenting opinion in which HUTCHINSON, J., joins.

McDERMOTT, J., files a dissenting opinion.

ROBERTS, Justice, concurring.

In confining their analyses to the question of whether appellant was denied his right to a public trial, the opinion of Mr. Justice Flaherty and the dissenting opinions of Mr. Justice Nix and Mr. Justice McDermott ignore what is clearly the crucial issue in this case, and indeed in every criminal case: whether appellant was denied his right to a *fair* trial. Because the sudden exclusion of the public from appellant's trial during the testimony of the Commonwealth's chief witness may well have served to prejudice the jury against appellant, justice requires that appellant be granted a new trial.

The record indicates that on the morning of March 8, 1979, the second day of appellant's trial, there were as many as fifty persons observing the trial, including members of a high school class and at least thirty prospective jurors not yet assigned to a trial. Before the lunch hour, and just before chief Commonwealth witness Thomas Colvin took the stand, the prosecuting attorney requested a recess, during which he informed the court that he had learned that there might be an attempt on Colvin's life. Instead of considering less prejudicial alternatives, the court, over defense objection, ordered the courtroom cleared of all spectators except for a few members of the media. Trial was resumed immediately. With only the media representatives present, witness Colvin then testified to his own involvement in the alleged homicide as well as to the involvement of appellant. It appears that no limitations on public access were imposed at any time during the remaining three days of trial.

The abrupt exclusion of members of the public during the presentation of the Commonwealth's most damaging testimony against appellant invited the jury to focus unduly

upon that testimony and to speculate as to the reason for the absence of spectators. In view of the nature of witness Colvin's testimony, the jury might well have concluded that the witness's safety had been threatened, a conclusion which would of course reflect adversely upon appellant.

Because of the clear potential for prejudice caused by the court's exclusion of the public during the key portion of the Commonwealth's case, appellant must be granted a new trial.

O'BRIEN, C.J., joins this concurring opinion.

McDERMOTT, Justice, dissenting.

The constitutional mandate for an open and public trial is not an end in itself. It is one of the means for securing a fair trial. It is a safeguard for the defendant and the court and a protection against inquisitions, star chambers and other secret proceedings wherein our freedom may be lost. It is not an inexorable necessity of fairness in all trials or on all occasions. Its purposes are well stated in the majority opinion and are as salutary now as in the days of William Penn.

Fortunately, the majority has confined its attention to the facts of this case and has not exalted the mandate into an all-encompassing rubric that suffers no exception. For, indeed, there are exceptions as this Court so plainly stated in *Commonwealth v. Knight,* 469 Pa. 57, 63–64, 364 A.2d 902, 904 (1976). Therein, a court was cleared to preserve the emotional health of a young witness:

> Initially, we agree with the position, advocated by Knight and Powell, that no showing of prejudice is required where a violation of an accused's right to a public trial is asserted. *United States v. Kobli,* 172 F.2d 919 (3d Cir.1949); *United States ex rel. Bennett v. Rundle,* 419 F.2d 599 (3rd [Sic] Cir.1969); 3 Wharton's Criminal Procedure, 12th ed., § 439. But the right to a public trial is not absolute; rather, it must be considered in relationship to other important interests. *United States v. Kobli,* supra;

*United States ex rel. Smallwood v. La Valle,* 377 F.Supp. 1148 (E.D.N.Y.1974), aff'd, 2 Cir., 508 F.2d 837, cert. denied 421 U.S. 920, 95 S.Ct. 1586, 43 L.Ed.2d 788. In considering such other interests, a court must assess all of the circumstances to determine if they present a situation in which an exclusion order is necessary. If the court determines a necessity exists, it may then issue an exclusion order; but the exclusion order must be fashioned to effectuate protection of the important interest without unduly infringing upon the accused's right to a public trial either through its scope or duration. *United States ex rel. Smallwood v. LaValle,* supra; *United States v. Kobli,* supra at 923; and see generally 3 Wharton's Criminal Procedure, 12 ed. § 439; 48 A.L.R.2d 1436 (1956). Ultimately, the determination of whether to exclude spectators, as well as the determination of the scope and duration of an exclusion order, must be left to the sound discretion of the trial court because it alone is sufficiently close to the circumstances to apprehend fully the subtleties that may be present. See generally, 48 A.L.R.2d 1436, 1450, § 8. Thus, only if a trial court abused its discretion in issuing an exclusion order or in fashioning the order will reversible error be found on appeal. Therefore, we must determine: (1) whether the court abused its discretion in issuing the exclusion order; and (2) if it did not, whether it abused its discretion in fashioning the scope and duration of the order.

*Commonwealth v. Knight,* 469 Pa. at 65–66, 364 A.2d at 906–907 (footnotes omitted).[1]

The question before us is not our commitment to the mandate, but rather its uses in securing a fair trial. We ought not confuse the actions of the trial judge in this case with the King's officers in the trial of William Penn. They are as different as are butterflies from condors. The trial judge here does not belong to a cabal sneaking upon the

1. *See also, United States v. Kobli,* 172 F.2d 919 (3d Cir.1949); *United States ex rel. Smallwood v. LaValle,* 377 F.Supp. 1148 (E.D.N.Y. 1974), *aff'd,* 508 F.2d 837 (2d Cir.), *cert. denied,* 421 U.S. 920, 95 S.Ct. 1586, 43 L.Ed.2d 788 (1975).

public liberty. The issue he faced was the exact converse; he was obliged to secure a fair trial in the teeth of threatened mortal violence, not from the minions of a King, but from a growing class of criminals who would snuff out a fair trial with a bullet, even in an open and public proceeding.

The trial judge was told, during a recess, that the witness next to be called, one Colvin, would be in danger on the witness stand. The information came from credible and concerned sources. It corroborated what was previously suspected in the violent history of this case. Indeed, Colvin was kept guarded for his safety in a different county jail. That he was in danger in the courtroom was and should be a matter of grave concern, not only for the witness, the spectators, jurors and parties, but even for that forgotten personage: the trial judge himself.

Given the circumstances the trial judge exercised sound discretion; if the threat was in the courtroom itself, the courtroom should be immunized. So brazen and desperate a threat must be dealt with swiftly. The trial judge moved swiftly; unknown to the jury, he cleared the courtroom of spectators and specifically excluded representatives of the press and news media from his order, that the trial and its conduct would be observed and reported to the public. The trial judge took the quickest, most effective steps to secure the safety of everyone.[2] Jurors and the public, to say nothing of the parties, should not have their safety compromised by any measure less than the most effective.

The appellant argues that he was injured because the jury could believe the courtroom was cleared to protect the witness. The trial court correctly perceived, however, that were the courtroom not cleared, the jury would have far graver consequences to consider, perhaps from their hospital beds or worse.

2. The scope and duration of the exclusion order did not seriously infringe upon the accused's right to public trial, because representatives of the news media were permitted in the courtroom to report the proceedings and because the courtroom was cleared only during the testimony of the single witness who had been threatened.

In *Commonwealth v. Knight,* this Court properly affirmed the clearing of a courtroom to protect the emotional health of a child witness. In this case the action was taken in the interest of saving many lives. How the concepts differ, or why one is more important than the other is not clear. I suggest that there is no meaningful difference and therefore dissent.

NIX, Justice, dissenting.

It cannot be questioned that the revered and venerable founder of this Commonwealth, as a result of his personal experiences with the English courts, intended to provide for his colony that plethora of rights necessary to assure that one accused of crime would receive a fair trial. The horrendous and barbaric spectre of injustice and tyranny presented by the trial of William Penn is not supportive of the premise that Penn intended, and the people of this Commonwealth embraced, the absolute and inflexible rule the opinion for the court has fashioned this day.

The opinion for the court is inaccurate in its attempt to offer the trial of William Penn as the historical foundation for the purported unique significance of a public trial in this jurisdiction. The transgressions exhibited in the conduct of the trial of William Penn were the court's intimidation of the jury in the performance of its function and the unwarranted exclusion of the accused during critical portions of the trial. From the historical data to which I am privy, there is no basis to believe the public was excluded from the trial.[1]

1. Clear evidence substantiating the fact that the trial, held on the 1st, 3rd, 4th and 5th of September, 1670, was open may be found in its transcript prepared by Quaker spectators and set forth in A Collection of the Works of William Penn in Two Volumes ... (London, J. Sowle, 1726) Vol. 1 (Sowle). At p. 10 in Sowle, William Mead stated, "I desire the jury and all the people to take notice of this injustice of the Recorder." Further, William Penn found it necessary to request silence in the court.

William Penn: I desire we may come more to the point, and that silence be commanded in the court.
and then the Crier called:
All manner of persons keep silence upon pain of imprisonment.

My research has uncovered no appellate case in this jurisdiction nor any legal scholar's treatise relating to the uniqueness of Pennsylvania law, which would suggest that the organic law of this Commonwealth requires greater protection than provided under the federal constitutional guarantees in the areas directly concerned in the Penn trial, i.e., function of court and jury and the exclusion of the defendant in criminal trials. I therefore must express my dissent to the opinion for the court's historicizing about an event unrelated to the issue here concerned and its invalidation of a legitimate and reasonable exercise of the court's duty to assure the safety of the participants and to preserve the integrity of the adjudicative process in this case.

Criminal trials in the United States have long been recognized as presumptively open and this "... presumption of openness inheres in the very nature of the criminal trial under our system of justice." *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 573, 100 S.Ct. 2814, 2825, 65 L.Ed.2d 973 (1980). Moreover, this fundamental principle is embodied in Article I, sections 9 and 11 of the Pennsylvania Constitution. Article I, section 9, states: "In all criminal prosecutions the accused hath a right to ... a speedy public trial by an impartial jury of the vicinage." Article I, section 11, states: "All courts shall be open."

However, equally well established is the principle that "... the right to a public trial is not absolute; rather, it must be considered in relationship to other important interests." *Commonwealth v. Knight,* 469 Pa. 57, 65, 364 A.2d 902, 906 (1976) (footnote omitted).[2] The relationship be-

—Silence in the Court.
Sowle, p. 11.

2. The United States Supreme Court has concluded that the closure of a criminal trial may be justified only in furtherance of a compelling governmental interest and then only by a means narrowly tailored to serve that interest. See *Globe Newspaper Co. v. Superior Court,* —— U.S. ——, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (statutorily mandated exclusion of press and public from entire trial held to be a violation of the First and Fourteenth Amendment). Although *Globe* involved the First and Fourteenth Amendment right of free access inuring to the benefit of the press and public, it is assumed that the

tween the right to a public trial and these other important interests, such as the orderly administration of justice, was set forth as follows:

> In considering such other interests, a court must assess all of the circumstances to determine if they present a situation in which an exclusion order is necessary. If the court determines a necessity exists, it may then issue an exclusion order; but the exclusion order must be fashioned to effectuate protection of the important interest without unduly infringing upon the accused's right to a public trial either through its scope or duration. *United States ex rel. Smallwood v. LaValle* [377 F.Supp. 1148 (E.D.N.Y.1974) aff'd 2 Cir., 508 F.2d 837, cert. denied 421 U.S. 920 [95 S.Ct. 1586, 43 L.Ed.2d 788] (1975) ]; *United States v. Kobli* [172 F.2d 919, 923 (3d Cir.1949) ]; and see generally 3 Wharton's Criminal Procedure, 12 ed. § 439; 48 A.L.R.2d 1436 (1956). Ultimately, the determination of whether to exclude spectators, as well as the determination of the scope and duration of an exclusion order, must be left to the sound discretion of the trial court because it alone is sufficiently close to the circumstances to apprehend fully the subtleties that may be present. See generally, 48 A.L.R.2d 1436, 1450, § 8. Thus, only if a trial court abused its discretion in issuing an exclusion order or in fashioning the order will reversible error be found on appeal.

*Id.* 469 Pa. at 66, 364 A.2d at 906–7 (footnotes omitted).

In *Knight,* this Court held that the trial court's exclusion of all spectators from the courtroom with the exception of the press and a group of law students during the testimony

liberty interest of the criminal defendant is at least as important on the continuum of constitutional rights as the interests of the press and public. *See In Re Oliver,* 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948). However, this case does not involve a total exclusion of the press, public and family of a defendant from an entire trial. Rather, the exclusion was limited to the family of the defendant and to the public during the testimony of a single witness. We do not believe that *Globe* is authority for concluding that a restricted admission to the proceedings during the testimony of a single witness for a most compelling reason is impermissible. *See Globe Newspapers,* —— U.S. ——, at ——, n. 22, 102 S.Ct. 2613 at 2621, n. 22.

of a young witness in order to protect that witness from emotional trauma was not an abuse of discretion and did not deprive the defendants of their constitutional rights to a public trial.

Moreover, the United States Supreme Court in *Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1980) [3] noted the existence of certain limited exceptions to the tradition of open trials.

> ... [W]ith respect to trials ... the tradition of publicity has not been universal. Exclusion of some members of the general public has been upheld, for example, in cases involving violent crimes against minors. *Geise v. United States,* 262 F.2d 151 (CA9 1958). The public has also been temporarily excluded from trials during testimony of certain witnesses. *E.g., Beauchamp v. Cahill,* 297 Ky. 505, 180 S.W.2d 423 (1944) (exclusion justified when children forced to testify to revolting facts); *State v. Callahan,* 100 Minn. 63, 110 N.W. 342 (1907) (exclusion justified when embarrassment could prevent effective testimony). *Hogan v. State,* 191 Ark. 437, 86 S.W.2d 931 (1935) (trial judge properly closed trial to spectators during testimony of 10-year-old rape victim); *United States ex rel. Smallwood v. LaValle,* 377 F.Supp. 1148 (EDNY), aff'd, 508 F.2d 837 (1974). Exclusion has also been permitted when the evidence in a case was expected to be obscene. *State v. Croak,* 167 La. 92, 118 So. 703 (1928). Finally, trial judges have been given broad discretion to exclude spectators to protect order in their courtrooms. *United States ex rel. Orlando v. Fay,* 350 F.2d 967 (CA2 1965) (exclusion of general public justified after an outburst in court by defendant and his mother.)

*Id.* 443 U.S. at 388, n. 19, 99 S.Ct. at 2910, n. 19.

In the instant case, during the testimony of the chief prosecution witness, the court ordered spectators removed from the courtroom, with the exception of certain members

**3.** For a carefully presented summary of the anglo-american history of the right to a public trial, *see* the opinion of Mr. Chief Justice Burger in *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 564–574, 100 S.Ct. 2814, 2820–2826, 65 L.Ed.2d 973 (1980).

of the news media. The basis for this order was that immediately before the prosecution witness was to testify, the prosecuting attorney informed the court, in chambers, of the following:

I have been informed by the Commanding Officer of the Pennsylvania State Police that they have information that there is going to be an attempt on the life of the next witness, and it has come from three different sources, and I was informed of this at recess.

The exclusion order was limited to the duration of this one witness' testimony. It is also to be noted that there was no advance warning of this particular death threat until the witness was about to testify. Moreover, notwithstanding the extraordinary facts of this case, the court did not exclude the media and the proceedings were fully transcribed. The interest in protecting the life of a witness and to preserve the integrity of the proceedings as a corollary to the orderly administration of justice, coupled with the limited scope and duration of the order, can hardly be said to have rendered the instant trial a star-chamber type of proceeding which a public trial avoids. *Commonwealth v. Knight, supra.*

I therefore dissent.

HUTCHINSON, J., joins in this dissenting opinion.