In the Interest of: M.B., born 10/10/88 J.B., born 2/14/94.

Appeal of: PG Publishing Company d/b/a The Pittsburgh Post–Gazette.

Superior Court of Pennsylvania.

Argued Oct. 23, 2002.
Filed Feb. 26, 2003.

Joseph T. Moran and Walter T. McGough, Pittsburgh, for appellant.

Karen L. Kiefer, Scottdale, for A.B., appellee.

John R. McCreary, Latrobe, for J.B., Sr., appellee.

James L. Liberto, New Kensington, for Guardian Ad Litem, appellee.

Leslie J. Uncapher, Vandergrift, for Guardian Ad Litem, appellee.

Mary A. Grec, Greensburg, for Westmoreland County Children and Youth Services, appellee.

Before: MUSMANNO, LALLY-GREEN and KLEIN, JJ.

KLEIN, J.

¶ 1 PG Publishing Company d/b/a The Pittsburgh Post–Gazette ("PG Publishing") appeals from the order of the Court of Common Pleas of Westmoreland County denying its motion to open juvenile dependency proceedings in the above-captioned case. This appeal presents an issue of first impression in this Commonwealth: whether juvenile dependency proceedings may be closed to the press and the general public. We hold that while there is a rebuttable constitutional presumption that juvenile dependency proceedings are open to the public, our courts possess an inherent power to control access to their proceedings and may deny access when appropriate. Once an interested party seeks access, however, the party seeking to keep the proceedings closed may rebut the presumption of openness by demonstrating that: (1) closure serves a compelling governmental interest, and (2) no less restrictive means to serve that interest exists. Because we find that the parties seeking closure in this case have demonstrated a compelling interest in protecting the privacy of the minor children and that no less restrictive means than total closure exists, we affirm.

¶ 2 On July 15, 2001, the 8–year–old sister of M.B. and J.B. was murdered. On August 7, 2001, M.B. and J.B., ages 12 and 7 at the time, were removed from their parents' custody and placed into foster care by the Westmoreland County Children's Bureau ("WCCB"). Soon thereafter, the WCCB filed a petition under 42 Pa.C.S.A. § 6302, alleging that the children were dependents because they lacked proper parental control or supervision and adequate physical, mental, or emotional care. A series of juvenile dependency hearings followed.

¶ 3 In the ensuing months, the local media published numerous articles about the homicide and the parents' battles in family court to regain custody of the children. Additionally, the media published reports about the parents' alleged theft from a funeral expense fund created for the deceased child and about a sexual relationship between the alleged perpetrator, 35–year–old Charles Koschalk, and M.B.

that had led to an earlier criminal prosecution. In many of these reports, the children's names were used.

¶ 4 In the midst of the dependency hearings, PG Publishing filed a motion to intervene and a motion to open the proceedings to the press and the general public. PG Publishing argued that the dependency proceedings should be open pursuant to Article I, Section 11 of the Pennsylvania Constitution and Section 6336(d) of Pennsylvania's Juvenile Act, 42 Pa.C.S.A. §§ 6301 *et seq.* On October 1, 2001, following argument, the trial court granted the motion to intervene and held the motion to open under advisement. On May 13, 2002, the trial court denied PG Publishing's motion to open. This timely appeal followed.[1]

¶ 5 On appeal, PG Publishing argues that the trial court abused its discretion in denying its motion to open the proceedings. While it agrees with the court's finding that the Pennsylvania Constitution supports a presumption of openness in juvenile dependency proceedings, PG Publishing challenges the court's application of the constitutional balancing test for determining when such proceedings may be closed. When an appeal challenges a trial court's decision to grant or deny access to judicial proceedings, we will reverse only if we find that the trial court abused its discretion. *See Storms v. O'Malley,* 779 A.2d 548, 569 (Pa.Super.2001), *app. denied,* 570 Pa. 688, 808 A.2d 573 (Pa.2002); *R.W. v. Hampe,* 426 Pa.Super. 305, 626 A.2d 1218, 1220 (1993). Because we find no such abuse of discretion in this case, we affirm.

¶ 6 We begin by addressing the trial court's finding of a presumption of openness in juvenile dependency proceedings. Our courts have recognized a constitutional right of public access to judicial proceedings based on Article I, Section 11 of the Pennsylvania Constitution, which provides that "[a]ll Courts shall be open." Pa. Const. art. I, § 11; *see Storms,* 779 A.2d at 569 (" 'In Pennsylvania, the common law, the first amendment to the United States Constitution, and the Pennsylvania Constitution, all support the principle of openness.' ") (citations omitted). This constitutional provision has been referred to as a "mandate" for open and public trials, *see Commonwealth v. Contakos,* 499 Pa. 340, 453 A.2d 578, 579 (1983) (plurality), and has been applied in both civil and criminal cases, *see, e.g., Contakos, supra; Storms, supra.*

■ ¶ 7 As the trial court recognized, however, no reported Pennsylvania decision has addressed whether the constitutional presumption of openness applies to juvenile dependency cases. Unlike criminal or civil cases, juvenile proceedings have traditionally been closed to the public in most jurisdictions. *See, e.g., United States v. A.D.,* 28 F.3d 1353, 1358 (3d Cir.1994) (noting that "[n]o centuries-old tradition of openness exists for juvenile proceedings"); *Ernst v. Children & Youth Servs.,* No. Civ. A. 91–3735, 1993 WL 343375, at *32 (E.D.Pa. Sept.3, 1993) ("[J]uvenile proceedings do not have a tradition of open access to press and public. . . ."), *rev'd in part on other grounds,* 108 F.3d 486 (3d Cir.1997); *In re T.R.,* 52

---

1. We note that jurisdiction properly lies in this Court because the order appealed from is separable from and collateral to the main cause of action and implicates constitutional concerns " 'too important to be denied review and too independent of the cause itself to require that appellate consideration be de-

ferred until the whole case is adjudicated.' " *Katz v. Katz,* 356 Pa.Super. 461, 514 A.2d 1374, 1376–77 (1986) (citing *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)); *see* Pa. R.A.P. 313.

Ohio St.3d 6, 556 N.E.2d 439, 449 (1990) ("The United States Supreme Court has repeatedly recognized that juvenile court proceedings have historically been closed to the public."). In addition, the purpose of dependency proceedings is to protect minor children and such proceedings are meant to be nonadversarial in nature. *See In re Gault,* 387 U.S. 1, 14–17, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) (juvenile proceedings are neither adversarial nor criminal); *In Interest of J.R.,* 436 Pa.Super. 416, 648 A.2d 28, 36 (1994) (throughout entire judicial process, "the juvenile is treated far differently than his or her adult counterpart"); *San Bernardino County Dep't of Pub. Social Servs. v. Superior Ct.,* 232 Cal.App.3d 188, 198, 283 Cal.Rptr. 332 (Cal.App.1991) (juvenile hearings were meant "to be informal, nonadversarial and private," which was "more consistent with the rehabilitative goals of the juvenile court than were the traditional adversarial proceedings employed in the adult criminal court"); *T.R.,* 556 N.E.2d at 448–49 (juvenile courts differ from courts of general jurisdiction in that "[h]earings are informal, and based on an inquisitorial model rather than an adversarial one").

¶ 8 Despite these differences, the trial court held that the presumption of openness should apply to juvenile proceedings in this Commonwealth because the plain language of our Constitution states unequivocally that *"[a]ll courts shall be open,"* Pa. Const. art. I, § 11 (emphasis added), and because our courts have not distinguished among types of proceedings in interpreting this provision. *See Commonwealth v. Harmon,* 469 Pa. 490, 366 A.2d 895, 897 (1976) (constitutional provisions should not "receive a technical or strained construction, but rather the words should be interpreted in their popular, natural and ordinary meaning"). We agree. We therefore hold that the constitutional presumption of openness applies to juvenile dependency matters.

¶ 9 Pennsylvania law provides both a constitutional and common law right of public access to judicial proceedings.[2] As even PG Publishing acknowledges, however, the right to an open and public trial is not absolute. *See Commonwealth v. Knight,* 469 Pa. 57, 364 A.2d 902, 906 (1976). We have recognized in many contexts that our courts have an inherent power to control access to their records and proceedings and may deny access when appropriate—for example, to protect the privacy rights of individuals or the integrity of ongoing criminal investigations. *See, e.g., Commonwealth v. Stilley,* 455 Pa.Super. 543, 689 A.2d 242, 252 (1997) (court may exclude public from trial "to prevent overcrowding, to maintain proper decorum, or where special circumstances warrant"); *PG Publ'g Co. v. Commonwealth,* 389 Pa.Super. 86, 566 A.2d 857, 862 (1989) (in determining whether to seal search warrant affidavits, court must balance presumption of openness against Commonwealth's need to keep information

---

2. There are two methods for analyzing requests for closure of judicial proceedings, each of which begins with a presumption of openness—a constitutional analysis and a common law analysis. *See R.W.,* 626 A.2d at 1220 n. 3; *Storms,* 779 A.2d at 569. Under the constitutional approach, which is based on the First Amendment of the United States Constitution and Article I, Section 11 of the Pennsylvania Constitution, the party seeking closure may rebut the presumption of open-

ness by showing that closure serves an important governmental interest and there is no less restrictive way to serve that interest. Under the common law approach, the party seeking closure must show that his or her interest in secrecy outweighs the presumption of openness. *See R.W.,* 626 A.2d at 1220 n. 3; *Katz,* 514 A.2d at 1377. Because PG Publishing asserts only a constitutional challenge here, we apply the constitutional analysis.

confidential so as not to jeopardize ongoing criminal investigation), *aff'd*, 532 Pa. 1, 614 A.2d 1106 (1992); *In re Affidavit for Search Warrant for 4011 Wilson Ave., Bethlehem, Pa.*, 42 Pa. D. & C.3d 467, 473 (C.P. Northampton County 1986) ("Courts have an inherent power to control their records and proceedings, and may deny access when appropriate.") (citing *Nixon v. Warner Comms., Inc.*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978)).[3]

¶ 10 In *Katz*, for example, this Court held that while there is a common law right of public access to judicial proceedings, the press and the general public may be excluded from equitable distribution hearings "where such access may become a vehicle for harmful or improper purposes." 514 A.2d at 1377. This is so due to the intensely private matters involved in divorce proceedings and because divorce proceedings have traditionally "received protection against public scrutiny." *Id.* at 1379. The same is true of juvenile proceedings. *See R.W.*, 626 A.2d at 1222 (recognizing that divorce and juvenile proceedings may be closed to public to prevent parties' embarrassment and protect privacy interests). As the late Judge Wieand explained:

> [T]he public may be "excluded, temporarily or permanently, from court proceedings or the records of court proceedings to protect private as well as public interests: to protect trade secrets, or the privacy and reputations [of innocent parties], as well as to guard against risks to national security interests, and to minimize the danger of an unfair trial by adverse publicity." "These are not necessarily the only situations where public access ... can properly be denied. A bright line test has yet to be formulated.

*Katz*, 514 A.2d at 1377–78 (internal citations omitted); *see also Stenger v. Lehigh Valley Hosp. Ctr.*, 382 Pa.Super. 75, 554 A.2d 954, 957 (1989) ("[E]ven in the context of a criminal trial, where federal Constitutional guarantees both explicitly and implicitly apply, access rights of the public are subject to limitation by judicial discretion and necessity.").

¶ 11 In this case, where the constitutional presumption of openness applies and where the trial court has exercised its discretion to close the proceedings, we employ a constitutional analysis. Once an interested party, such as the press, seeks access to such proceedings, the party seeking to keep the proceedings closed may rebut the presumption of openness by demonstrating that: (1) the denial of public access serves an important governmental interest, and (2) no less restrictive means to serve that interest exists. *R.W.*, 626 A.2d at 1220 n. 3. To satisfy these requirements, the party seeking closure must demonstrate "that the 'material is the kind of information that the courts will protect and that there is good cause for the order to issue.'" *Id.* (citation omitted). A party establishes "good cause" by showing that opening the proceedings "'will work a clearly defined and serious injury to the party seeking closure.'" *Storms*, 779 A.2d at 569 (citation omitted). We have emphasized that "[o]nly a *compelling* government interest justifies closure and then only by a means narrowly tailored to serve that interest." *Commonwealth v. Murray*, 348 Pa.Super. 439, 502 A.2d 624, 629 (1985) (emphasis in original). Ultimately, the decision whether to grant or deny public access is within the sound

---

**3.** We note that appellate courts are not bound by decisions of the courts of common pleas. *Commonwealth v. Webster*, 452 Pa.Super. 258, 681 A.2d 806 (1996); *Jamison v. Concepts Plus, Inc.*, 380 Pa.Super. 431, 552 A.2d 265 (1988).

discretion of the trial court. *See Knight*, 364 A.2d at 906–07; *Katz*, 514 A.2d at 1378. As discussed below, we find no abuse of that discretion here.

¶ 12 First, following a comprehensive analysis of the competing interests involved, the trial court found that the WCCB and guardians *ad litem* demonstrated a compelling interest in protecting the privacy rights of M.B. and J.B. Tragically, these young children have suffered the devastating loss of their sister and endured the embarrassment of testifying about intensely personal matters in court. Indeed, the United States Supreme Court has recognized that protecting minors from the trauma and embarrassment of testifying in public is, in and of itself, a compelling state interest under a First Amendment analysis.[4] *See Globe Newspaper Co. v. Superior Ct.*, 457 U.S. 596, 607–08, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *see also R.W.*, 626 A.2d at 1222 (recognizing "the salutary reasons of protecting the privacy interests of minors"); *T.R.*, 556 N.E.2d at 451 ("While the public's interest in access is important and deserving of protection, the state also has a compelling interest in the protection of children.").

¶ 13 The trial court also carefully considered the psychological and emotional harm to the children that would result from continued publicity, especially in light of their young ages and the fact that they will certainly testify in these proceedings in the future. *See San Bernardino*, 232 Cal. App.3d at 198, 200, 283 Cal.Rptr. 332 ("'[P]ublicity, with its attendant stigma, generally impedes integration of a youth into the community.'... Further, children who must face their peers in school might be subjected to special pressures if the matter is publicized.") (citation omitted); *T.R.*, 556 N.E.2d at 451 ("[I]ntense publicity surrounding the events which have brought a child into the juvenile court may psychologically harm the child, making it more difficult, if not impossible, for the child to recover from those events."). As the trial court noted, publicity may also jeopardize M.B. and J.B. indirectly because witnesses may be hesitant to speak freely and foster parents may be reluctant to get involved for fear of sacrificing their own privacy. Furthermore, publicity under these circumstances is inconsistent with the nonadversarial nature of juvenile proceedings. *See Gault*, 387 U.S. at 14–17, 87 S.Ct. 1428; *see also San Bernardino*, 232 Cal.App.3d at 199, 283 Cal.Rptr. 332 ("[P]rivate hearings were not intended to simply avoid publicity and its resulting stigma, but were also part and parcel of the informal and nonadversarial nature of juvenile court hearings."); *T.R.*, 556 N.E.2d at 451 ("Public access has the potential to endanger the fairness of the proceeding or disrupt the orderly process of adjudication.").

¶ 14 Notably, PG Publishing does not argue that privacy is not a compelling public interest. Rather, it argues that no privacy interests exist on behalf of M.B. and J.B. because their identities have already been revealed through the news reports that surfaced after their sister's murder. This argument is spurious. While it is true that the children's names and certain details about their family life have been publicized, we believe, as the trial court did, that the fact that they have received some publicity enhances their need for privacy now. The media has already thrust rather embarrassing

4. In cases involving requests for closure of judicial proceedings, the same analysis applies under both Article I, Section 11 of the Pennsylvania Constitution and the First Amendment to the United States Constitution. *See Murray*, 502 A.2d at 628 n. 4; *R.W.*, 626 A.2d at 1220 n. 3.

information about their personal lives into the public eye. As the trial court wisely observed, "[t]he more information that is revealed, the more stress the children experience, the more they are stigmatized, embarrassed, and subject to whispers and speculation." (Opinion & Order at 27.)

¶ 15 Moreover, as the WCCB and guardians *ad litem* argue, Pennsylvania's Juvenile Act, 42 Pa.C.S.A. §§ 6301 *et seq.*, demonstrates our legislature's compelling interest in safeguarding children involved in juvenile proceedings. Section 6336(d), which applies to dependency proceedings, explicitly provides:

> Except in hearings to declare a person in contempt of court and in [delinquency] hearings as specified in subsection (e), *the general public shall be excluded from hearings under this chapter.* Only the parties, their counsel, witnesses, the victim and counsel for the victim, other persons accompanying a party or a victim for his or her assistance, and any other person as the court finds have a proper interest in the proceeding or in the work of the court shall be admitted by the court.

42 Pa.C.S.A. § 6336(d) (emphasis added). As originally enacted, the Juvenile Act had closed both delinquency and dependency proceedings to the public. In 1995, however, the legislature amended the Act to open certain *delinquency* proceedings to the public, *see* 42 Pa.C.S.A. § 6336(e), but it left *dependency* proceedings closed subject to a few exceptions, *see* 42 Pa.C.S.A. § 6336(d). As PG Publishing points out, the Official Comment to Section 6336(d) indicates that members of the press may be persons with a "proper interest" in attending and reporting on dependency proceedings, and thus the court may admit them in its discretion. *See* 42 Pa.C.S.A. § 6336(d) (Official Comment—1976). Nonetheless, we find that while PG Publishing may have a "proper interest" in these proceedings, it should not be granted access here because of the serious psychological and emotional harm that additional publicity may cause the children.[5]

¶ 16 Next, the trial court found that the WCCB and guardians *ad litem* established that there is no less restrictive means to serve the compelling interest in protecting the children's privacy rights than total closure of the proceedings. As alternatives to total closure, PG Publishing suggests that the court could somehow "control[ ]" or "limit[ ]" references to "specific confidential or harmful materials" while the press is present or grant the press limited access to the "non-confidential portions of the proceedings," such as the portions concerning the WCCB's performance. (R. 64a–65a; Appellant's Brief at 12, 15–16.)[6]

¶ 17 We believe, however, that neither approach would be practical or feasible. It would impose a significant burden on the

---

5. As the trial court emphasized, unlike children in juvenile delinquency proceedings, M.B. and J.B. "have done nothing to bring public attention to themselves" and thus the public's interest "is less keen here than it is ... in delinquency proceedings." (Opinion & Order at 25.) *See also Ernst,* 1993 WL 343375, at *29 (noting that dependency hearings generally do not carry "the indicia of a 'criminal prosecution' " present in delinquency hearings).

6. We reject PG Publishing's argument that the trial court improperly placed the burden on PG Publishing, rather than on the parties seeking closure, to propose alternatives to total closure. To the contrary, the trial court explicitly stated in its opinion that "[n]o burden is assigned to [PG Publishing]" under the constitutional analysis. (Opinion & Order at 20.) The fact that the court considered, and ultimately rejected, the alternatives voluntarily proposed by PG Publishing at the hearing was not an abuse of discretion.

court and the parties to attempt to control references to confidential information while the press is present in such a complex case. And because witnesses often discuss matters out of sequence, confidential or sensitive information inevitably would be revealed during the open portions of the proceedings. Recognizing that every aspect of this case involves "extraordinarily sensitive" information, the trial court determined that "there is no portion of these proceedings that will not address the details of [the children's] lives." (Opinion & Order at 28; *see id.* at 28 n. 11.) Thus, the trial court properly found that there is no alternative short of total closure that will serve the children's privacy interests.

¶ 18 Accordingly, we conclude that the trial court did not abuse its discretion in denying PG Publishing's motion to open the juvenile dependency proceedings to the press and the general public.

¶ 19 Order affirmed.